**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LUIS ALBERTO GALVIS MUJICA, on
behalf of himself and as
representative of the Estates of
Tereza Mujica Hernan, Edilma Leal
Pacheco and Johanny Hernandez
Becerra; MARIO GALVIS GELVEZ, on
behalf of himself, individually, and
as heir of the decedents Tereza
Mujica Hernandez, Edilma Leal
Pacheco and Johanny Hernandez
Becerra; JOHN MARIO GALVIS
MUJICA, through his guardian ad
litem and on behalf of himself,
individually, and as heir of the
decedents Tereza Mujica Hernandez,
Edilma Leal Pacheco and Johanny
Hernandez Becerra,
                    *Plaintiffs-Appellees*,

                    v.

AIRSCAN INC.,
                    *Defendant-Appellant*,
_____

OCCIDENTAL PETROLEUM
CORPORATION,
                    *Defendant*,

No. 10-55515

D.C. No.
2:03-cv-02860-
GW-JWJ

UNITED STATES OF AMERICA,
                    *Movant*.

LUIS ALBERTO GALVIS MUJICA, on behalf of himself and as representative of the Estates of Tereza Mujica Hernan, Edilma Leal Pacheco and Johanny Hernandez Becerra; MARIO GALVIS GELVEZ, on behalf of himself, individually, and as heir of the decedents Tereza Mujica Hernandez, Edilma Leal Pacheco and Johanny Hernandez Becerra; JOHN MARIO GALVIS MUJICA, through his guardian ad litem and on behalf of himself, individually, and as heir of the decedents Tereza Mujica Hernandez, Edilma Leal Pacheco and Johanny Hernandez Becerra,
                    *Plaintiffs-Appellees*,

                    v.

OCCIDENTAL PETROLEUM CORPORATION,
                    *Defendant-Appellant*,
_____

AIRSCAN INC.,
                    *Defendant*,

No. 10-55516

D.C. No.
2:03-cv-02860-
GW-JWJ

UNITED STATES OF AMERICA,
                    *Movant.*

LUIS ALBERTO GALVIS MUJICA, on
behalf of himself and as
representative of the Estates of
Tereza Mujica Hernan, Edilma Leal
Pacheco and Johanny Hernandez
Becerra; MARIO GALVIS GELVEZ, on
behalf of himself, individually, and
as heir of the decedents Tereza
Mujica Hernandez, Edilma Leal
Pacheco and Johanny Hernandez
Becerra; JOHN MARIO GALVIS
MUJICA, through his guardian ad
litem and on behalf of himself,
individually, and as heir of the
decedents Terza Mujica Hernandez,
Edilma Leal Pacheco and Johanny
Hernandez Becerra,
                    *Plaintiffs-Appellants*,

                    v.

OCCIDENTAL PETROLEUM
CORPORATION; AIRSCAN INC.,
                    *Defendants-Appellees*,

                    and

UNITED STATES OF AMERICA,
                    *Movant.*

No. 10-55587

D.C. No.
2:03-cv-02860-
GW-JWJ

OPINION

Appeal from the United States District Court
for the Central District of California
George H. Wu, District Judge, Presiding

Argued and Submitted
March 5, 2014—Pasadena, California

Filed November 12, 2014

Before: Jay S. Bybee and Sandra S. Ikuta, Circuit Judges,
and Thomas S. Zilly, Senior District Judge.[*]

Opinion by Judge Bybee;
Partial Concurrence and Partial Dissent by Judge Zilly

---

[*] The Honorable Thomas S. Zilly, Senior District Judge for the U.S. District Court for the Western District of Washington, sitting by designation.

# SUMMARY[**]

## Torture Victims Protection Act / Alien Tort Statute / Comity

The panel affirmed the dismissal, on remand, of an action brought under the Torture Victims Protection Act, the Alien Tort Statute, and California state law, alleging that two U.S.-headquartered corporations, Occidental Petroleum and AirScan, were complicit in the 1998 bombing of a Colombian village by members of the Colombian Air Force.

The panel held that plaintiffs' notice of appeal was not untimely because after the district court issued its ruling on limited remand, the case returned to the Court of Appeals, which continued to have jurisdiction under plaintiffs' original notice of appeal.

The panel held that pursuant to *Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702 (2012), plaintiffs lacked a viable claim under the TVPA because defendants were corporations rather than natural persons.

The panel held that pursuant to *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013), plaintiffs lacked a viable claim under the ATS because they did not rebut the presumption against extraterritorial application of the statute by alleging that defendants were U.S. corporations and that actions or decisions furthering the purported conspiracy between defendants and the Colombian Air Force took place

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

in the United States.  The panel declined to remand the case for amendment of the complaint in light of *Kiobel*.

Disagreeing with the district court, the panel held that plaintiffs' state-law claims must be dismissed on the ground of international comity.  Interpreting *Hartford Fire Ins. Co. v. Cal.*, 509 U.S. 764 (1993), the panel held that adjudicatory comity, which involves discretionary deference in declining to exercise jurisdiction over a case properly adjudicated in a foreign state, does not require a "true conflict" between domestic and foreign law.  The panel concluded that in light of a State Department Statement of Interest and an amicus brief filed by the United States, the United States' interest in having the case adjudicated exclusively in Colombia was strong.  The panel held that because of the strength of the U.S. government's interest in respecting Colombia's judicial process, the weakness of California's interest in the case, the strength of Colombia's interests in serving as an exclusive forum, and the adequacy of the Colombian courts as an alternative forum, plaintiffs' state-law claims were nonjusticiable under the doctrine of international comity.

District Judge Zilly concurred in part and dissented in part.  He concurred with the majority's conclusion that plaintiffs' claim under the TVPA was properly dismissed. Dissenting from the majority's holding that plaintiffs' lacked a viable claim under the ATS, he wrote that *Kiobel* did not require "conduct" that occurred within the United States, and that plaintiffs should be allowed to amend their complaint. Judge Zilly also dissented from the majority's holding that international comity barred adjudication of plaintiffs' state law claims.

**COUNSEL**

Paul L. Hoffman (argued), Adrienne J. Quarry, and Victoria Don, Schonbrun DeSimone Seplow, Harris Hoffman & Harrison, LLP, Venice, California; Terry Collingsworth and Christian Levesque, Conrad & Scherer, LLP, Washington, D.C.; Daniel M. Kovalik, Pittsburgh, Pennsylvania; Bridget Arimond, Center for International Human Rights, Northwestern University Law School, Chicago, Illinois, for Plaintiffs-Appellants-Cross-Appellees.

Daniel P. Collins (argued), Munger, Tolles & Olson LLP, Los Angeles, California, for Defendant-Appellee-Cross-Appellant Occidental Petroleum Corporation.

Thomas E. Fotopolous, and Sara M. Fotopolous, Fotopolous & Fotopolous, P.A., Titusville, Florida; Kenneth J. Berke, Berke & Kent LLP, Calabasas, California, for Defendant-Appellee-Cross-Appellant AirScan, Inc.

Marco B. Simons, Richard L. Herz, and Jonathan Kaufman, Washington, D.C., for Amicus Curiae Earthrights International.

William J. Aceves, California Western School of Law, San Diego, California, for Amicus Curiae Constitutional and International Law Scholars.

## OPINION

BYBEE, Circuit Judge:

This suit arises out of the 1998 bombing of a Colombian village by members of the Colombian Air Force (CAF). Plaintiffs,[1] citizens and former residents of Colombia, brought suit in California against two U.S.-headquartered corporations, Occidental Petroleum and AirScan, for their alleged complicity in the bombing. In two opinions issued in 2005, the district court first refused to dismiss the case on grounds of *forum non conveniens* and international comity, *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1134 (C.D. Cal. 2005) ("*Mujica I*"), but then granted Defendants' motion to dismiss all of the claims under the political question doctrine. *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164 (C.D. Cal. 2005) ("*Mujica II*").

In a prior appeal, we declined to decide the issues presented and remanded the case to the district court for two purposes: first, "to consider whether a prudential exhaustion requirement applies in this case, and if so, whether that requirement bars any claims in this case," and, second, to "consider the effect, if any," of two Colombian court opinions related to the bombing. *Mujica v. Occidental Petroleum Corp.*, 564 F.3d 1190, 1192 (9th Cir. 2009) ("*Mujica III*"). On limited remand, the district court found that prudential exhaustion was not required. It also found that, if prudential exhaustion were required, Occidental had met its burden of

---

[1] We refer to Mr. Luis Mujica and the other Plaintiffs/Appellants/Cross-Appellants as "Plaintiffs" and to Occidental Petroleum and AirScan either as "Occidental" or "Defendants." Defendant AirScan has adopted and joined Occidental's briefing.

pleading and proving the availability of local remedies. *Mujica v. Occidental Petroleum Corp.*, Case No. CV-03-2860 (C.D. Cal., Mar. 8, 2010) ("*Mujica IV*"). Plaintiffs and Defendants appealed and cross-appealed.

We hold that Plaintiffs lack a valid claim under either the Torture Victim Protection Act (TVPA) or the Alien Tort Statute (ATS). We affirm the district court's judgment of dismissal with respect to Plaintiffs' state-law claims, but we do so on the ground of international comity. Although the district court rejected dismissal on that ground, we conclude that the district court abused its discretion by applying the incorrect legal standard in its comity analysis, specifically by concluding erroneously that a "true conflict" between domestic and foreign law is required for the application of international comity in all circumstances. *Mujica I*, 381 F. Supp. 2d at 1155. Guided by the correct standard for the application of comity, and informed by the district court's findings of fact in *Mujica IV* regarding the adequacy of Colombia as an alternative forum, we conclude that the state-law claims before us are not justiciable under the doctrine of international comity.

## I. BACKGROUND

A. *The 1998 Bombing*

The district court described the facts of the underlying events as follows:

> The instant case arises from a bombing that occurred in Santo Domingo, Colombia on December 13, 1998. In 1998, Plaintiffs lived in Santo Domingo. The Defendants,

Occidental Petroleum Corp. ("Occidental") and AirScan, Inc., are both American companies; the former is located in Los Angeles, the latter in Florida. Defendant Occidental operates, as a joint venture with the Colombian government, an oil production facility and pipeline in the area of Santo Domingo.

Plaintiffs allege the following relevant facts. Since 1997, Defendant AirScan has provided security for Defendant Occidental's oil pipeline against attacks from left-wing insurgents. Prior to 1998, Defendants worked with the Colombian military, providing them with financial and other assistance, for the purpose of furthering Defendant Occidental's commercial interests. On several occasions during 1998, Defendant Occidental provided Defendant AirScan and the Colombian military with a room in its facilities to plan the Santo Domingo raid. Defendant AirScan and the Colombian Air Force ("CAF") carried out this raid for the purpose of providing security for Defendant Occidental (i.e., protecting its oil pipeline) and was not acting on behalf of the Colombian government. During the raid, three of Defendant AirScan's employees, along with a CAF liaison, piloted a plane with CAF markings and that was paid for by Defendant Occidental. From this airplane, Defendant AirScan provided aerial surveillance for the CAF, helping the CAF

identify targets and choose places to deploy troops.

On December 13, 1998, residents of Santo Domingo saw low-flying CAF helicopters overhead and attempted to communicate that they were civilians by lying down on the road and covering their heads with white shirts. Soon thereafter, several witnesses saw an object (or several objects) drop from one of the CAF helicopters. One of the cluster bombs dropped by the CAF exploded directly in the town of Santo Domingo, destroying homes and killing seventeen civilians and wounding twenty-five others. Of the seventeen killed, six were children. During the attack, the CAF helicopters knowingly fired on civilians attempting to escape and on those who were trying to carry the injured to a medical facility. Soon thereafter, other CAF troops entered the town, blocked civilians from leaving, and ransacked their homes.

While the purpose of the Santo Domingo raid was to protect Defendant Occidental's pipeline from attack by left-wing insurgents, no insurgents were killed in the attack. These insurgents were located at least one to two kilometers outside of Santo Domingo. Defendants knew that the insurgents were not

in Santo Domingo but carried out the attack
nonetheless.

*Mujica II*, 381 F. Supp. 2d at 1168–69 (internal citations
omitted)).

B.  *Proceedings in Colombian Courts*

The 1998 Santo Domingo bombing led to two legal
actions in Colombia: a criminal action brought by the
Colombian government against three CAF officers who were
allegedly responsible for the bombing and a civil suit brought
by Plaintiffs (and several other persons) against the
government of Colombia.

1.  Criminal Action

The Colombian Public Prosecutor's Office opened a
preliminary investigation into the Santo Domingo bombing
the day after it occurred, on December 14, 1998.   On
September 21, 2007, in *In re Cesare Romero Pradilla, et al.*,
the Twelfth Criminal Court of the Circuit of Bogota,
Colombia convicted three CAF officers of manslaughter. On
September 24, 2009, the same court affirmed the verdict on
remand from a higher court, finding that all three defendants
were guilty of manslaughter and related crimes. The court
then sentenced two of them to no more than 380 months'
imprisonment and one to no more than seventy-two months'
imprisonment. The court also imposed fines on all three
defendants.

2. Civil Action

On September 25, 2000, Plaintiffs (and others) filed a complaint against the Republic of Colombia, the Colombian Ministry of Defense, the Colombian Army, and the CAF, in regional court in Arauca, the region in Colombia where Santo Domingo is located. Plaintiffs sought damages for wrongful death and physical and psychological injuries to Plaintiffs and their relatives. On May 20, 2004, the Arauca court entered judgment in favor of Plaintiffs and awarded damages amounting to about $700,000. On December 13, 2007, in *Mario Galvis Gelves, et al. v. The Nation*, a Colombian appellate court approved a settlement between Plaintiffs and the Colombian government, holding that "[t]he liability of the defendant can be found, because the incident that gave rise to the settlement has been proven." On April 27, 2009, the Director of Legal Affairs of the National Defense Ministry directed the payment of 1,393,649,934.73 Colombian pesos (roughly $737,000) to the victims through their attorney. Nothing in the record suggests that the victims did not receive that settlement payment.

C. *Proceedings Below*

While the Colombian litigation was ongoing, Plaintiffs filed a complaint in United States district court on April 23, 2003. The complaint, as amended, brought claims for extra-judicial killing; torture; crimes against humanity; cruel, inhuman, and degrading treatment; and war crimes under the Alien Tort Statute (ATS), 28 U.S.C. § 1350, and the Torture Victims Protection Act (TVPA), 28 U.S.C. § 1350 Note. Plaintiffs also filed state law claims for wrongful death, intentional infliction of emotional distress, negligent infliction of emotional distress, and violations of California

Business & Professional Code § 17200. *See Mujica II*, 381 F.
Supp. 2d at 1169, 1176.

In January 2004, the district court requested the views of
the U.S. Department of State. *Id.* at 1169. In April 2004, the
Department of State submitted a Statement of Interest (SOI)
indicating that it did not have a position on the foreign policy
implications of the action. *Id.* Eight months later, however,
the Department of State submitted a second SOI indicating
that it now opposed the litigation as adverse to U.S.-
Colombian relations. The Department of State attached to the
SOI two short démarches[2] from the Government of Colombia
opposing the litigation. *Id.* In June 28, 2005, the court issued
two opinions responding to Occidental's motion to dismiss
the suit.

    1.  *Mujica I — Forum Non Conveniens* and International
        Comity

In *Mujica I*, 381 F. Supp. 2d at 1134, the district court
denied Occidental's motion to dismiss based on *forum non
conveniens* and international comity. *Id.* at 1163–64. With
respect to *forum non conveniens*, the district court concluded
that, despite a May 2004 civil verdict against the Republic of
Colombia in favor of these plaintiffs in Colombian regional
court, Colombia was an inadequate forum for Plaintiffs'
claims. The court found that because the plaintiffs had
received relief in Colombia, in a suit that did not include
Defendants, "these Plaintiffs [would] not be able to recover
against these Defendants." *Id.* at 1148. According to the

---

    [2] A démarche is "[a]n oral or written diplomatic statement, esp[ecially]
one containing a demand, offer, protest, threat, or the like." Black's Law
Dictionary 523 (10th ed. 2014).

district court, "Colombia would be an inadequate forum because Plaintiffs could not obtain a remedy against Defendant as they could in this Court." *Id.*

With regard to comity, which the court analyzed alongside the related doctrine of international abstention, the court held that it did not apply. It adopted Plaintiffs' argument that "at least in the Ninth Circuit, the application of international comity is generally limited to cases where there is a 'true conflict' between domestic and foreign law." *Id.* at 1155. Under that standard, the court explained that there was no "true conflict" between United States law and Colombian law: "Since the Court has not made any findings of liability or provided any remedies, there is no *present* conflict between the Court's proceeding with the instant case and any proceedings in Colombia." *Id.* at 1156. The district court acknowledged that there was "the possibility of an inconsistency between a future, potential judgment of this Court and a judgment of a Colombian court," *id*., but the court refused to dismiss the suit "without the knowledge that Plaintiffs have an alternative forum in which they are able to obtain a remedy." *Id.* at 1163–64.

## 2. *Mujica II* — Political Question Doctrine

In a second opinion issued the same day, *Mujica II*, 381 F. Supp. 2d at 1164, the district court considered whether to dismiss various claims under the TVPA, the ATS, the foreign affairs doctrine, the act of state doctrine, and the political question doctrine. Although the court worked its way through all of these statutes and doctrines and would have dismissed some but not all of Plaintiffs' claims, it ultimately concluded that the entire suit warranted dismissal under the

political question doctrine. *Id.* at 1195; *see also Baker v. Carr*, 369 U.S. 186 (1962).**³**

The district court held that two *Baker* factors supported dismissal of the suit—factor four, "impossibility of a court's undertaking independent resolution [of the issue] without expressing lack of the respect due coordinate branches of government," and factor five, the "unusual need for unquestioning adherence to a political decision already made." *Baker*, 369 U.S. at 217. In reaching that conclusion, the court "focus[ed] on the Supplemental Statement of Interest," *Mujica II*, 381 F. Supp. 2d at 1191, and found that its assertion that U.S. foreign policy "would be negatively impacted by proceeding with the instant case" supported a finding that "proceeding with the litigation would indicate a 'lack of respect' for the Executive's preferred approach of

---

**³** *Baker* lists six alternative grounds under which a case may raise a nonjusticiable political question:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217.

handling the Santo Domingo bombing and relations with Colombia in general." *Id.* at 1194. In a footnote, the court wrote that "[f]or similar reasons, the fifth *Baker* factor, adherence to a policy decision, would also render the instant case non-justiciable." *Id.* at 1194 n.25.

### 3.  *Mujica III* — Limited Remand

Plaintiffs appealed the district court's order granting Defendants' Rule 12(b)(6) motion and "further appeal[ed] any and all adverse rulings on issues in the Court's second order entered on June 29, 2005, . . . [and] further appeal[ed] any and all prior rulings adverse to Plaintiffs."  On July 27, 2005, Occidental filed a "notice of conditional cross-appeal," appealing the district court's denial of Defendants' motion to dismiss the action on *forum non conveniens* and international comity grounds, as well as any adverse judgment in the court's ruling granting Defendants' Rule 12(b)(6) motion. AirScan filed a nearly verbatim cross-appeal the next day.

In March 2006, during the pendency of the appeal, the United States filed an amicus brief on behalf of Defendants urging affirmance "[b]ecause adjudication of this case would adversely affect the United States' foreign policy interests." And while it agreed with the ultimate disposition of the case on political question and preemption grounds, it also believed "that dismissal of the plaintiffs' claims is most appropriate as a matter of international comity."

In May 2009, we remanded the case to the district court in an order that reads, in its entirety, as follows:

> In light of the intervening authority of *Sarei v. Rio Tinto*, 550 F.3d 822 (9th Cir.

2008) (en banc) ["*Sarei II*"], this case is remanded to the district court to consider whether a prudential exhaustion requirement applies in this case, and if so, whether that requirement bars any claims in this case. On remand, the district court should also consider the effect, if any, of the decision of the Council of State of the Republic of Colombia in *Mario Galvis Gelves, et al. v. The Nation*, slip op. (Council of State, Rep. of Colombia, Ad. Law Div., Sec. 3, Dec. 13, 2007) and the decision of the Court No. 12 for Criminal Matters of the Circuit of Bogot[a] of the Republic of Colombia in *In re Cesare Romero Pradilla, et al.*, slip op. (Sept. 21, 2007).

*Mujica III*, 564 F.3d at 1190.

    4. *Mujica IV* — Prudential Exhaustion and the Colombian Cases

By the time we heard the appeal in *Mujica III*, the original district court judge, Judge William J. Rea, had passed away. Accordingly, on remand, the case was assigned to Judge George H. Wu, who, in accordance with our order, issued a "Ruling on Limited Remand as to the Prudential Exhaustion Issue."

In response to our first question, the district court held that "there is a sufficiently strong nexus between the claims asserted in this lawsuit and the United States that local exhaustion should not be required." The court found that, "even if the nexus [to the United States] were held to be weak, . . . Occidental ha[d] not shown that the claims in this

case do not implicate matters of universal concern," such as "war crimes and indiscriminate violent assaults on people at large." Thus, "Occidental ha[d] not shown that those claims against Defendants in this case [were] likely to be subject to an exhaustion requirement."

The court then addressed the second question we had posed on remand: the effect of the successful civil and criminal litigation brought in Colombia. Judge Wu came to a different conclusion from Judge Rea. Judge Wu held that remedies were available in Colombia, whether their availability was "assessed as of now or as of 2003 when the case was filed" and that, despite Judge Rea's contrary conclusion, Occidental "seem[ed] to have met its initial burden of showing the availability of local remedies." The court noted that Dr. Fernando Hinestrosa, Occidental's Colombian law expert, "stated that Plaintiffs could bring a suit against Occidental today in Colombia, and could have brought one in September 2000, or any time in between. Occidental ha[d] consented to jurisdiction in Colombia, and the statute of limitations under Colombian law ha[d] not yet run." The district court also found Plaintiffs' arguments that it was unsafe for them to pursue the litigation in Colombia unavailing, because Occidental showed that Plaintiffs had pursued litigation in Colombia "for years" and had traveled there, even though they now live elsewhere. Furthermore, Plaintiffs had not shown that their physical presence in Colombia was required to pursue the litigation. Accordingly, "[i]f exhaustion were required, Occidental would probably prevail on its demonstration of the availability of local remedies and the lack of futility." The court concluded that prudential exhaustion was not required in the case, and if it were to impose such a requirement, "it would find that Defendant Occidental ha[d] met its burden of pleading and

proving the availability of local remedies and Plaintiffs' failure to exhaust them."

On April 7, 2010, Defendants AirScan and Occidental filed essentially identical "Notice[s] of Conditional Appeal," which noted that "[b]y declining to impose an exhaustion requirement on limited remand, the district court's Order on Remand leaves unchanged the prior judgment of dismissal with prejudice in this case, and thereby effectively re-enters that judgment as of the date of entry of the Order on Remand." On April 19, 2010, Plaintiffs filed a "Notice of Cross-Appeal" challenging the district court's March 8, 2010 ruling.

## II. STANDARD OF REVIEW

Dismissal for failure to state a claim under Rule 12(b)(6) is reviewed *de novo*. *Stone v. Travelers Corp.*, 58 F.3d 434, 436–37 (9th Cir. 1995). In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all factual allegations in the Complaint and draw all reasonable inferences in favor of the nonmoving party. *Silvas v. E\*Trade Mortg. Corp.*, 514 F.3d 1001, 1003 (9th Cir. 2008).

We review the district court's decision regarding international comity for abuse of discretion. *See Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 994 F.2d 996, 999 (2d Cir. 1993); *Remington Rand Corp.-Del. v. Bus. Sys. Inc.*, 830 F.2d 1260, 1266 (3d Cir. 1987). We follow a two-part test to determine whether a district court abused its discretion. *See United States v. Hinkson*, 585 F.3d 1247, 1261 (9th Cir. 2009) (en banc). "[T]he first step of our abuse of discretion test is to determine de novo whether the trial court identified the correct legal rule to apply to the relief requested. If the trial

court failed to do so, we must conclude it abused its discretion." *Id.* at 1261–62 (footnote omitted). If the district court identified the correct legal rule, we move on to the second step of the test and "determine whether the trial court's application of the correct legal standard was (1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" *Id.* at 1262 (quoting *Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 577 (1985)).

## III. APPELLATE JURISDICTION

Defendants question whether Plaintiffs' April 19, 2010, notice of appeal following the district court's decision on remand was timely and, accordingly, whether we have jurisdiction under 28 U.S.C. § 1291. Defendants argue that the district court's March 8, 2010, ruling "triggered the 30-day clock for Plaintiffs to file their notice of appeal" under Federal Rule of Appellate Procedure 4(a).[4] And since "the district court's ruling left intact a dismissal *with prejudice*, Defendants on April 7, 2010 timely filed conditional notices of appeal." They cite *Abbs v. Sullivan*, 963 F.2d 918 (7th Cir. 1992), which held that there is no appellate jurisdiction if a party without standing is the only party to file an appeal within thirty-days of the final judgment, even if the other party files a cross-appeal within fourteen days of the appeal by the party without standing. *Id.* at 925. Defendants also cite

---

[4] Federal Rule of Appellate Procedure 4 directs that, in a civil case, a notice of appeal "must be filed with the district clerk within 30 days after entry of the judgment or order appealed from." Fed. R. App. P. 4(a). Exceptions, which are not relevant here, extend that period to sixty days if one of the parties is the United States or a federal agency or officer; if certain other motions are filed; or if the appellant is an inmate. *See* Fed. R. App. P. 4(a)(1)(B), 4(a)(4), and 4(c).

*Stephanie-Cardona LLC v. Smith's Food & Drug Centers, Inc.*, 476 F.3d 701, 705 (9th Cir. 2007), in which we held that a "late notice of cross-appeal is not fatal because the court's jurisdiction over the cross-appeal derives from the initial notice of appeal." But if a court lacks jurisdiction over an appeal, "it necessarily lacks jurisdiction over the cross-appeal," and the cross-appeal must be dismissed. *Id.*

Defendants have misapprehended the limited nature of our original 2009 remand. In that order, we neither addressed any of the issues raised by Plaintiffs' appeal nor vacated the June 28, 2005, district court order dismissing the case. *See Mujica III*, 564 F.3d at 1192. Instead, we remanded the case for two specific purposes: for fact-finding on the applicability of the prudential exhaustion doctrine, *see Sarei II*, 550 F.3d at 822, and for consideration of the effect of the Colombian criminal and civil cases related to this litigation. *Id.* The district court understood our order as a limited remand. Its order is entitled "Ruling on Limited Remand as to the Prudential Exhaustion Issue." And the parties understood it to be limited as well. Defendants titled their brief "Opening Brief on Limited Remand from the Ninth Circuit," and Plaintiffs titled theirs "Plaintiffs' Response to Defendants' Opening Brief on Limited Remand from Ninth Circuit." The district court's 2010 ruling did not state it was reentering the 2005 judgment, and we did not disturb that judgment on remand. Accordingly, after the district court issued its limited ruling, the entire case returned to us. We continue to have jurisdiction under Plaintiffs' original notice of appeal, filed July 11, 2005. *See Richmond v. Chater*, 94 F.3d 263, 268 (7th Cir. 1996) (observing that appellate courts usually retain jurisdiction when previous panel was unwilling or unable to decide the appeal and remanded the case to tie up loose ends); *see also* 28 U.S.C. § 1291.

## IV.  FEDERAL CLAIMS

We have no need to consider whether any prudential doctrines counsel dismissing Plaintiffs' federal claims under the TVPA and the ATS, as Plaintiffs have no viable claim under either statute.

### A.  *TVPA Claims*

The TVPA authorizes a federal cause of action against any "individual" who commits an act of torture or extrajudicial killing "under actual or apparent authority, or color of law, of any foreign nation."  28 U.S.C. § 1350 Note. In a case decided while this appeal was pending, the Supreme Court examined the TVPA and held that the term "individual," as used in the statute, "encompasses only natural persons."  *Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702, 1705 (2012).  Thus, the TVPA "does not impose liability against organizations."  *Id.*

Defendants in this case are both corporations rather than natural persons.  In light of *Mohamad*, therefore, Plaintiffs' TVPA claims must be dismissed.  *Accord, e.g.*, *Cardona v. Chiquita Brands Int'l, Inc.*, 760 F.3d 1185, 1188–89 (11th Cir. 2014).

### B.  *ATS Claims*

The ATS provides that "district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  The ATS "is a jurisdictional statute creating no new causes of action," although the First Congress adopted it on the assumption that

"district courts would recognize private causes of action for certain torts in violation of the law of nations. . . ." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004).

"The question here is not whether petitioners have stated a proper claim under the ATS, but whether a claim may reach conduct occurring in the territory of a foreign sovereign."[5] *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013). Just as the Supreme Court has clarified the meaning of the TVPA since Plaintiffs filed their complaint, so too has its recent decision in *Kiobel* refined our understanding of the extent to which the ATS applies extraterritorially. Analyzing Plaintiffs' ATS claims in light of *Kiobel*, we conclude that these claims must also be dismissed.

In *Kiobel*, Nigerian petitioners who later became U.S. residents brought tort claims under the ATS, based on events in Nigeria, against foreign corporations that had only attenuated contacts with the United States—listings on the New York Stock Exchange and an affiliation with a public relations office in New York. *See* 133 S. Ct. at 1662–63 (majority opinion); *id.* at 1677–78 (Breyer, J., concurring). The Court found that these ATS claims were barred, holding that "the presumption against extraterritoriality applies to

---

[5] The district court held that all of Plaintiffs' ATS claims were properly rooted in "binding customary international law" norms, as required to state a claim after the Supreme Court's decision in *Sosa*, though it dismissed Plaintiffs' claim for "cruel, inhuman, and degrading treatment" because the consequences of permitting ATS claims based on such conduct would be "impractical." *See Mujica II*, 381 F. Supp. 2d at 1178–83. Because we conclude that the presumption against extraterritoriality bars the federal courts from hearing Plaintiffs' ATS claims, we express no opinion as to whether Plaintiffs' allegations were otherwise proper under *Sosa*.

claims under the ATS" and that "nothing in the statute rebuts that presumption." *Id.* at 1669.

Although the Court did not hold that plaintiffs may *never* bring ATS claims based on extraterritorial conduct, it made clear that, in order to be viable, any such claims must "touch and concern the territory of the United States" and "must do so with sufficient force to displace the presumption against extraterritorial application." *Id.* Plaintiffs contend that their claims meet this requirement because Defendants are U.S. corporations and because Plaintiffs have alleged that "actions or decisions furthering the [purported] conspiracy" between Defendants and the CAF "took place in the United States." We disagree.

The allegations that form the basis of Plaintiffs' claims exclusively concern conduct that occurred in Colombia. For example, Plaintiffs allege that the bombing was planned from an office in Colombia, that employees of Defendant AirScan provided support during the bombing, that Defendant Occidental provided a plane used for targeting in the operation, and that both Defendants gave material and logistical support to the CAF. The only statement before this court that so much as alludes to any conduct within the United States is found in Plaintiffs' reply brief, filed after *Kiobel*, in which Plaintiffs point to the allegations in their complaint that Defendants aided and abetted and conspired with the CAF and speculate that some of that conduct, such as the making of the contract between the two Defendants, could have occurred in the United States. Such speculation is not an adequate basis on which to allow Plaintiffs' claims

to go forward.**[6]**    Plaintiffs have the burden of pleading "sufficient *factual matter*, accepted as true, to 'state a claim to relief that is plausible on its face,'" and a mere conjecture that conduct may have occurred in the United States does not meet that burden.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

---

**[6]** The dissent reads the statements in Plaintiffs' reply brief regarding the contract between Occidental and AirScan far more credulously than we do, arguing that they constitute sufficient evidence of acts in the United States to preclude our dismissing these ATS claims.  This credulous appraisal is simply mistaken. As the dissent itself acknowledges, Plaintiffs have, at most, "suggested" to the court that the contract "*might* have been executed within our borders."  It is not clear to us, moreover, that the bare fact that the Defendants' contract for "security services" was made in the United States would establish ATS jurisdiction in any event.  In the only ATS case in which a court cited such a contract as evidence of U.S. conduct, the contract was far more specifically addressed to the activities that eventually gave rise to the plaintiffs' ATS claims.  *See Al Shimari v. CACI Premier Tech., Inc.*, 758 F.3d 516, 522 (4th Cir. 2014) (finding ATS jurisdiction where, *inter alia*, defendant made a contract with the federal government in the United States for "interrogation-related services" that included a Statement of Work specifying activities to be peformed).

The dissent also insists that "Plaintiffs are entitled to the reasonable inference" that the acts they allege occurred in Colombia "could not have occurred" without support from Defendants' "U.S. offices."  We disagree. The only pleaded facts the dissent cites to support that inference are Plaintiffs' allegations that three participants in the bombing were employed by AirScan and that the bombing was planned at an Occidental site in Colombia.  These highly circumstantial allegations do not support a sweeping inference that Defendants, *through actions in the United States*, took sufficient part in the bombing to be subject to ATS jurisdiction under *Kiobel.  See Balintulo v. Daimler AG*, 727 F.3d 174, 192 (2d Cir. 2013) (allegation that U.S. corporations' South African subsidiaries aided and abetted human rights violations in South Africa did not "tie[] the . . . human rights violations to actions taken within the United States").

In apparent recognition of this defect in their complaint, Plaintiffs have requested leave to amend their complaint in light of *Kiobel.* The dissent likewise urges us to grant this relief. But although we acknowledge that *Kiobel* worked a significant change in the legal prerequisites for an extraterritorial ATS claim, and that such intervening changes in the law often warrant granting parties leave to amend, we do not believe that granting Plaintiffs leave to amend would serve any purpose. *See, e.g.*, *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995) ("Futility of amendment can, by itself, justify the denial of . . . leave to amend.").

This is not a case in which the parties have had no opportunity to respond to an intervening change in Supreme Court law. Defendants filed a supplemental brief in the wake of the *Kiobel* decision urging dismissal of Plaintiffs' ATS claims, and Plaintiffs devoted 15 pages of their reply brief to *Kiobel*'s touch-and-concern test. Plaintiffs admitted in that brief that they likely "cannot uncover the evidence they need" to allege "plotting [by Defendants] in the United States without jurisdictional discovery." Similarly, Plaintiffs' experienced and knowledgeable counsel candidly represented to the court at oral argument—which was held *eleven months* after *Kiobel* was decided—that he could not say that Plaintiffs would be able to amend their complaint to allege acts by the Defendants in the United States with the specificity required by *Iqbal*, absent discovery. The Supreme Court has stated, however, that plaintiffs must satisfy the pleading requirements of Rule 8 *before* the discovery stage, not after it. *See Iqbal*, 556 U.S. at 678–79 (explaining that Rule 8 "does not unlock the doors of discovery for a plaintiff armed

with nothing more than conclusions").[7]  We think it clear that no amendment to the complaint at *this* stage of the litigation—i.e., prior to discovery—could add "sufficient factual matter" related to domestic conduct to enable the complaint to survive a motion to dismiss, and we therefore decline to remand this case for amendment of the complaint.[8]

---

[7] The dissent cites cases that it claims demonstrate that other courts of appeals have rejected this view of *Iqbal*.  To the extent that any of those decisions suggests that courts retain discretion to permit discovery whenever a plaintiff has failed to satisfy Rule 8's plausibility standard, it is simply incompatible with *Iqbal* and *Twombly*.  *See Iqbal*, 556 U.S. at 686 ("Because respondent's complaint is deficient under Rule 8, he is not entitled to discovery, cabined or otherwise."); *Twombly*, 550 U.S. at 559 ("It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through careful case management"); *see also, e.g.*, *Vega v. Davis*, 572 F. App'x 611, 616 (10th Cir. 2014) (rejecting plaintiff's argument that motion to dismiss should be denied due to his "lack of access to relevant information"); *Carter v. DeKalb Cnty., Ga.*, 521 F. App'x 725, 728 (11th Cir. 2013) (holding that plaintiff who failed to allege plausible claim against defendants was not entitled to discovery because "discovery *follows* the filing of a well-pleaded complaint. It is not a device to enable the plaintiff to make a case when his complaint has failed to state a claim." (internal quotation marks omitted)).

[8] Not content simply to disagree with the foregoing futility analysis, the dissent also suggests that we should not have undertaken it, leaving the question of futility of amendment to be addressed—if at all—by the district court on a supplemented record.  But as the dissent acknowledges, the parties have already been litigating this case for nearly a decade at the motion-to-dismiss stage.  Judicial economy and common sense both counsel that we ought not prolong this case still further by remanding to the district court for a futility analysis when it is obvious to us that leave to amend is unwarranted.  *Accord Baloco v. Drummond Co., Inc.*, 767 F.3d 1229, 1239 (11th Cir. 2014) (declining to remand ATS case to district court for amendment of complaint where post-*Kiobel* briefing provided "sufficient information" from which to conclude that amendment would be futile, and a remand would "needlessly extend [the] litigation,

In the absence of any adequate allegations of conduct in the United States, the only remaining nexus between Plaintiffs' claims and this country is the fact that Defendants are both U.S. corporations. That fact, without more, is not enough to establish that the ATS claims here "touch and concern" the United States with sufficient force.

Admittedly, *Kiobel* (quite purposely) did not enumerate the specific kinds of connections to the United States that could establish that ATS claims "touch and concern" this country. *See Kiobel*, 133 S. Ct. at 1669 (Kennedy, J., concurring). It may well be, therefore, that a defendant's U.S. citizenship or corporate status is one factor that, in conjunction with other factors, can establish a sufficient connection between an ATS claim and the territory of the United States to satisfy *Kiobel*.[9] But the Supreme Court has

---

which began over eleven years ago"); *see also, e.g.*, *Sylvia Landfield Trust v. City of L.A.*, 729 F.3d 1189, 1196 (9th Cir. 2013) (affirming denial of leave to amend where, after proposed amendments, complaint would still fail to "allege sufficient facts that amount to more than a sheer possibility that Defendants have acted unlawfully" (alteration and internal quotation marks omitted)); *Dougherty v. City of Covina*, 654 F.3d 892, 901 (9th Cir. 2011) (affirming denial of leave to amend on futility grounds, where plaintiff "failed to allege any facts" in support of a particular legal theory and "could have identified any such fact in his briefing or argument before us, but he did not").

[9] The dissent suggests that we "essentially disregard[]" Defendants' U.S. citizenship, but we are hardly dismissing Defendants' U.S. citizenship out of hand. We do not contend that this factor is *irrelevant* to the *Kiobel* inquiry; we merely hold that it is not *dispositive* of that inquiry. *But see Mastafa v. Chevron Corp.*, __ F.3d __, 2014 WL 5368853, at *13 (2d Cir. Oct. 23, 2014) ("Whether a complaint passes jurisdictional muster accordingly depends upon alleged conduct by anyone—U.S. citizen or not—that took place in the United States and aided and abetted a violation of the law of nations. A complaint cannot be 'saved' for jurisdictional

never suggested that a plaintiff can bring an action based solely on extraterritorial conduct *merely because* the defendant is a U.S. national. To the contrary, the Court has repeatedly applied the presumption against extraterritoriality to bar suits meeting that description. *See, e.g.*, *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 250–51, 269 (2010) (holding that Section 10(b) did not reach claims of securities fraud against "foreign *and American* defendants" based on largely extraterritorial conduct (emphasis added)); *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 455 (2007) (holding that presumption against extraterritoriality barred patent infringement case brought against U.S. corporation but based on conduct abroad); *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 258–59 (1991) (holding that Title VII did not apply to U.S. citizens employed by U.S. employers overseas). Nothing in *Kiobel* suggests that the Court would not adhere to this pattern in an ATS case. *Cf. Balintulo*, 727 F.3d at 190 ("[I]f all the relevant conduct occurred abroad, that is simply the end of the matter under *Kiobel*.").[10]

Our reading of *Kiobel* is in accord with that of other federal courts. So far as we can ascertain, since *Kiobel* was decided, only *one* court has so much as suggested that an ATS claim is always viable when the defendant is a U.S.

---

purposes simply because a U.S. citizen happened to commit the alleged violation").

[10] The dissent suggests otherwise, pointing to a concurring opinion in *Kiobel* in which four Justices suggested that a defendant's U.S. citizenship would suffice for ATS jurisdiction. But that view did not command a majority and, as we discuss *infra*, at 30–32 & n.11, every federal appellate and district court except one has rejected the view advocated by the dissent. We cannot accept that, by following that overwhelming body of authority, we have "improvidently extend[ed] *Kiobel*."

citizen or corporation. Every remaining federal court has dismissed ATS claims whose only connection to this country was the defendant's U.S. citizenship.[11]

---

[11] *See Cardona*, 760 F.3d at 1189–90 (rejecting ATS claim even though primary defendant was a U.S. corporation, because "[a]ny tort here . . . occurred outside the territorial jurisdiction of the United States"); *Ben-Haim v. Neeman*, 543 F. App'x 152, 155 (3d Cir. 2013) (dismissing ATS claims against multiple defendants, including two U.S.–based nonprofits, where underlying conduct occurred in Israel); *Jovic v. L-3 Servs., Inc.*, __ F. Supp. 3d __, 2014 WL 4748614, at *5 (N.D. Ill. Sept. 24, 2014) (dismissing ATS claims against U.S. corporations because presumption against extraterritoriality was not rebutted); *Doe I v. Cisco Sys., Inc.*, __ F. Supp. 2d __, 2014 WL 4446381, at *5 (N.D. Cal. Sept. 5, 2014) (holding that defendant's U.S. corporate citizenship "in and of itself is not enough to touch and concern the United States with sufficient force for the ATS to apply"); *Warfaa v. Ali*, __ F. Supp. 2d __, 2014 WL 3734121, at *2–3 (E.D. Va. July 29, 2014) (dismissing ATS claims arising out of events in Somalia, brought against defendant residing in United States); *Adhikari v. Daoud & Partners*, 2013 WL 4511354, at *7 (S.D. Tex. Aug. 23, 2013) (dismissing ATS claim against U.S. corporation because "[t]he conduct underlying Plaintiffs' ATS claim is entirely foreign"); *Ahmed-Al-Khalifa v. Al-Assad*, 2013 WL 4401831, at *2 (N.D. Fla. Aug. 13, 2013) (dismissing ATS claims against U.S. President, Congress, and U.S. corporation, because "the violations at issue all occurred outside the United States"); *Giraldo v. Drummond Co., Inc.*, 2013 WL 3873960, at *8 (N.D. Ala. July 25, 2013) (granting summary judgment to U.S. defendants on ATS claims, where "*nothing*" supported "Plaintiffs' contention that [defendant] made decisions in the United States"); *Mwangi v. Bush*, 2013 WL 3155018, at *4 (E.D. Ky. June 18, 2013) (noting that ATS claim against former U.S. president could not proceed because all alleged conduct occurred in Kenya); *see also Doe v. Exxon Mobil Corp.*, __ F. Supp. 3d __, 2014 WL 4746256, at *12, 14 (D.D.C. Sept. 23, 2014) ("[T]he presumption against extraterritoriality is not displaced by a defendant's U.S. citizenship alone."); *cf. Balintulo*, 727 F.3d at 192–93 (declining to issue writ of mandamus ordering district court to dismiss ATS claims against U.S. companies arising out of acts by their South African subsidiaries, but explaining that, "[i]n *all* cases, . . . the ATS does not permit claims based on illegal conduct that occurred entirely in the

By contrast, in all of the post-*Kiobel* cases in which courts have permitted ATS claims against U.S. defendants to go forward, the plaintiffs have alleged that at least some of the conduct relevant to their claims occurred in the United States. *See Al Shimari*, 758 F.3d at 530–31 (holding that ATS claims against U.S. corporation touched and concerned the United States, where conduct occurred pursuant to a contract made in the United States between defendant and the U.S. government, and managers in the United States approved the misconduct and attempted to cover it up); *Krishanti v. Rajaratnam*, 2014 WL 1669873, at *10 (D.N.J. Apr. 28, 2014) (holding that *Kiobel* did not bar plaintiffs' ATS claims because they were based on "actions that occurred within the United States"); *Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304, 321 (D. Mass. 2013) (holding ATS claims against U.S. citizen were not barred where alleged torts occurred "to a substantial degree within the United States, over many years, with only infrequent actual visits to Uganda"); *Mwani v. Bin Laden*, 947 F. Supp. 2d 1, 5 (D.D.C. 2013) (holding that ATS claims touched and concerned the United States because plaintiffs had "presented evidence that

---

territory of another sovereign"); *Mamani v. Berzaín*, 2014 WL 2069491, at *11 (S.D. Fla. May 20, 2014) (holding that ATS claims against defendants residing in the United States were barred because all conduct relevant to claims "occurred on foreign soil"); *In re S. African Apartheid Litig.*, 2013 WL 6813877, at *2 (S.D.N.Y. Dec. 26, 2013) (ordering, in case against U.S. corporations where all conduct alleged in original complaint occurred abroad, that plaintiffs amend complaint to "plausibly plead that . . . defendants engaged in actions that touch and concern the United States"). *But see Ahmed v. Magan*, 2013 WL 4479077, at *2 (S.D. Ohio Aug. 20, 2013) (holding in the alternative that presumption against extraterritoriality was overcome by the fact that the defendant was a lawful permanent resident of the United States).

. . . overt acts in furtherance of [the defendants'] conspiracy took place in the United States").

Plaintiffs point to a legal opinion written by Attorney General William Bradford in 1795 as evidence that "the ATS could reach U.S. nationals extraterritorially under the right circumstances." In that Opinion, Attorney General Bradford addressed a 1794 incident in which several American citizens had joined in a French attack on the British colony of Sierra Leone, in violation of the United States' official position of neutrality with respect to France and Britain. Bradford commented that "there can be no doubt that the company or individuals who have been injured by these acts of hostility have a remedy by a civil suit in the courts of the United States," pursuant to the ATS. Breach of Neutrality, 1 U.S. Op. Att'y Gen. 57 (1795).

The Bradford Opinion is too slender a reed, however, to support the broad assertion of ATS jurisdiction that Plaintiffs ask of us. The Supreme Court considered the Bradford Opinion in *Kiobel* and found that it "defies a definitive reading" and "hardly suffices to counter the weighty concerns underlying the presumption against extraterritoriality." *Kiobel*, 133 S. Ct. at 1668. The Court went on to conclude that "[n]othing about th[e] historical context" of the ATS, taken as a whole (including not only the events described in the Bradford Opinion but also other episodes contemporaneous with the passage of the ATS), "suggests that Congress . . . intended federal common law under the ATS to provide a cause of action for conduct occurring in the territory of another sovereign." *Id.* at 1668–69. Consequently, the Bradford Opinion cannot support Plaintiffs' claim that a defendant's corporate U.S. citizenship

is a sufficient connection with the United States to establish ATS jurisdiction.[12]

We acknowledge that judges—including our dissenting colleague in this case—have eloquently argued that the United States has an obligation to provide redress for aliens injured *whenever* American citizens or corporations violate the law of nations. *See, e.g.*, *Cardona*, 760 F.3d at 1193 (Martin, J., dissenting) ("The United States would fail to meet the expectations of the international community were we to allow U.S. citizens to travel to foreign shores and commit violations of the law of nations with impunity."). But we agree with several of our sister circuits that this policy argument is unavailing, as "the determination of foreign policy goals and the means to achieve them is not for us." *Cardona*, 760 F.3d at 1191 (majority opinion); *see also Balintulo*, 727 F.3d at 191–92. The federal courts cannot exercise jurisdiction under the ATS beyond the limits that Congress has prescribed, no matter how well-intentioned our motives for doing so.

To conclude, Plaintiffs' ATS claims against Defendants are based solely on conduct that occurred in Colombia, and the only nexus with the United States that Plaintiffs allege is the fact that both Defendants are U.S. corporations. We hold that these ATS claims do not touch and concern the territory of the United States "with sufficient force to displace the

---

[12] The dissent argues that, the Bradford Opinion aside, "the principle that a sovereign may exercise jurisdiction to prescribe the conduct of its nationals outside its territory is widely recognized." But even if that is so, the question before us is not whether the United States *may* regulate the conduct of U.S. nationals abroad, but whether it *has* done so via the ATS. Modern-day practices and norms do not help us answer that question.

presumption against extraterritorial application," *Kiobel*, 133
S. Ct. at 1669, and that they must be dismissed.

## V. INTERNATIONAL COMITY

Finally, we dismiss Plaintiffs' state-law claims based on
the doctrine of international comity.  We do not reach any
other putative bases—whether constitutional or prudential—
for dismissing these claims.[13]    *Cf. Bi v. Union Carbide
Chems. & Plastics Co.*, 984 F.2d 582, 584 (2d Cir. 1993).

The federal common law doctrine of international comity
is applicable to these state law claims notwithstanding the
general rule that federal courts apply California's substantive
law when sitting in diversity.  *Erie R.R. Co. v. Tompkins*,

---

[13] For example, we do not decide whether a California court would
decline to reach these tort claims due to their extraterritorial nature, or
whether the federal foreign affairs doctrine would preclude a California
court from hearing these claims.  *See, e.g.*, *Zschernig v. Miller*, 389 U.S.
429, 440–41 (1968).

The dissent believes, as we do, that Plaintiffs' state-law claims must
be dismissed, but it argues that it is inappropriate for us to consider the
international comity doctrine here before addressing the foreign affairs
doctrine, which was one of the district court's original bases for
dismissing these claims (along with the political-question doctrine).  We
disagree.  We have not raised the question of international comity *sua
sponte*; the district court fully considered the comity doctrine and the issue
has been briefed and argued by both sides.  As the dissent acknowledges,
we are permitted to affirm the district court's decision on any ground
supported by the record, *see, e.g.*, *ASARCO, LLC v. Union Pac. R. Co.*,
765 F.3d 999, 1004 (9th Cir. 2014), and we consider it important to
correct the district court's conclusion that the international comity doctrine
is inapplicable to this sort of case.  The dissent offers no persuasive reason
why our choice to address that issue is improper, other than its
disagreement with the merits of our comity analysis.

304 U.S. 64 (1938). The Supreme Court has made an exception to the *Erie* doctrine "when there are uniquely federal interests at stake," such as "litigation that implicates the nation's foreign relations." *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1232 (11th Cir. 2004). For instance, "an issue concerned with a basic choice regarding the competence and function of the Judiciary and the National Executive in ordering our relationships with other members of the international community must be treated exclusively as an aspect of federal law." *Banco National de Cuba v. Sabbatino*, 376 U.S. 398, 425 (1964) (holding that the federal common law act of state doctrine precluded a federal court from considering a state law challenge to the Cuban government's expropriation of certain property). In a similar vein, the federal foreign affairs doctrine requires federal courts to dismiss state law claims based on their potential to interfere with U.S. foreign relations. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 401 (2003); *Zschernig*, 389 U.S. at 440–41. For the same reason, we must consider the applicability of the international comity doctrine to these state law claims.

International comity "'is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.'" *In re Simon*, 153 F.3d 991, 998 (9th Cir. 1998) (quoting *Hilton v. Guyot*, 159 U.S. 113, 164 (1895)); *see also Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for the S. Dist. of Iowa*, 482 U.S. 522, 543 n.27 (1987) ("Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states."); *Black's*

*Law Dictionary* 324 (10th ed. 2014) (defining "comity" as "[a] practice among political entities (as countries, states, or courts of different jurisdictions), involving esp[ecially] mutual recognition of legislative, executive, and judicial acts").

Comity is not a rule expressly derived from international law, the Constitution, federal statutes, or equity, but it draws upon various doctrines and principles that, in turn, draw upon all of those sources. It thus shares certain considerations with international principles of sovereignty and territoriality; constitutional doctrines such as the political question doctrine; principles enacted into positive law such as the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602, 1611 (2006); and judicial doctrines such as *forum non conveniens* and prudential exhaustion.[14] Comity is a "rule of 'practice, convenience, and expediency' rather than of law" that courts have embraced "to promote cooperation and reciprocity with foreign lands." *Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*, 109 F.3d 850, 854 (2d Cir. 1997) (quoting *Somportex Ltd. v. Phila. Chewing Gum Corp.*, 453 F.2d 435, 440 (3d Cir. 1971)).

---

[14] "Case law equivocates between calling international comity a value and a rule. As a value, it reflects the sense that cases affecting foreign interests should be decided in a manner that accounts for these interests in some way." Eric A. Posner & Cass R. Sunstein, Chevron*izing Foreign Relations Law*, 116 Yale L.J. 1170, 1180 (2007). As a rule, courts "cite international comity as an explanation for outcomes that are not explicitly driven by" other international relations doctrines, such as extraterritoriality, foreign sovereign immunity, the act of state doctrine, and the *Charming Betsy* canon, which holds that "an ambiguous statute will be interpreted to avoid conflicts with international law." *Id.* at 1179–80.

International comity is a doctrine of prudential abstention, one that "counsels voluntary forbearance when a sovereign which has a legitimate claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction under principles of international law." *United States v. Nippon Paper Indus. Co.*, 109 F.3d 1, 8 (1st Cir. 1997). "The doctrine has never been well-defined," but comity "is clearly concerned with maintaining amicable working relationships between nations, a 'shorthand for good neighbourliness, common courtesy and mutual respect between those who labour in adjoining judicial vineyards.'" *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 423 (2d Cir. 2005) (quoting *British Airways Bd. v. Laker Airways Ltd.*, [1984] E.C.C. 36, 41 (Eng. C.A.)).[15]

There are essentially "two distinct doctrines [which] are often conflated under the heading 'international comity.'" *In re S. African Apartheid Litig.*, 617 F. Supp. 2d 228, 283 (S.D.N.Y. 2009). The first is legislative or "prescriptive comity," which guides domestic courts as they decide the extraterritorial reach of federal statutes. *See Kiobel*, 133 S. Ct. at 1664; *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 165 (2004); *see also Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 817 (1993) (Scalia, J., dissenting) (describing prescriptive comity as "the respect sovereign nations afford each other by limiting the reach of their laws");

---

[15] *See also Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984) ("'Comity' summarizes in a brief word a complex and elusive concept—the degree of deference that a domestic forum must pay to the act of a foreign government not otherwise binding on the forum."); Donald Earl Childress III, *Comity as Conflict: Resituating International Comity as Conflict of Laws*, 44 U.C. Davis L. Rev. 11, 13 (2010) (comity "is one of the most important, and yet least understood, international law canons").

*In re Maxwell Commc'n Corp. PLC by Homan*, 93 F.3d 1036, 1047 (2d Cir. 1996) (describing prescriptive comity as a "canon of [statutory] construction [that] might shorten the reach of a [domestic] statute").

The second strain of the doctrine is referred to as "comity among courts" or adjudicatory comity, which "may be viewed as a discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state." *Maxwell*, 93 F.3d at 1047; *see also Hartford Fire*, 509 U.S. at 817 (Scalia, J., dissenting) (describing "comity of the courts" as a set of principles "whereby judges decline to exercise jurisdiction over matters more appropriately adjudged elsewhere").[16]    Thus, adjudicatory comity "involves . . . the discretion of a national court to decline to exercise jurisdiction over a case before it when that case is pending in a foreign court with proper jurisdiction." *JP Morgan Chase Bank*, 412 F.3d at 424. In such a case, "deference to the foreign court is appropriate so long as the foreign proceedings are procedurally fair and . . . do not contravene the laws or public policy of the United States." *Id.*

---

[16] Some commentators have identified other strains of international comity, including so-called "executive comity," which "provides the basis for courts to invoke principles of deference to foreign sovereignty, as in cases involving the Foreign Sovereign Immunities Act [ ] and act of state doctrine," *see* Childress III, *supra*, at 47, but only the first two are relevant here.

A. *Standards for Applying Comity*

    1.  Whether Adjudicatory Comity Requires a "True Conflict"

The Supreme Court's most recent most discussion of international comity was in *Hartford Fire*, 509 U.S. at 798. *Hartford Fire* did not explain, however, what factors we should or must consider when addressing comity; in particular, it left unclear whether a "true conflict" is a predicate to prudential abstention on the grounds of comity. The district court in the instant litigation held that, "at least in the Ninth Circuit, the application of international comity is generally limited to cases where there is a 'true conflict' between domestic and foreign law." *Mujica I*, 381 F. Supp. 2d at 1155–56 (citing *Hartford Fire*, 509 U.S. at 794–95, and *In re Simon*, 153 F.3d at 999). And Plaintiffs argue here that "[t]he existence of a 'true conflict' is a threshold requirement for abstention on international comity grounds," and that "[i]n this Court, . . . [the] rule is absolutely clear that application of the law of international comity is limited to cases in which there is in fact a true conflict between domestic and foreign law."

We do not think that *Hartford Fire* stands for the proposition adopted by the district court and urged by Plaintiffs. *Hartford Fire* involved the reach of U.S. antitrust laws, which applied extraterritorially; in that case, the question was whether a U.S. district court could exercise jurisdiction over antitrust claims filed against a group of London reinsurers. 509 U.S. at 769, 798–99. The London reinsurers argued that, based on international comity, the antitrust laws should not be read to extend to their activities, which were regulated by British law. *See id.* at 797–98.

The Supreme Court stated that the "only substantial question in th[e] litigation" was "whether there [wa]s in fact a true conflict between domestic and foreign law." *Id.* at 798 (internal quotation marks omitted). The defendants argued that applying federal antitrust laws would conflict with British law because Britain had established its own comprehensive regulatory regime for antitrust issues and the defendants' conduct was consistent with British law. *Id.* at 798–99. But the Court held that this situation did not qualify as a "true conflict," explaining that "[n]o conflict exists, for these purposes, where a person subject to regulation by two states can comply with the laws of both." *Id.* at 799. (internal quotation marks and citation omitted). And "[s]ince the London reinsurers d[id] not argue that British law require[d] them to act in some fashion prohibited by the law of the United States, or claim that their compliance with the laws of both countries [wa]s otherwise impossible, [the Court saw] no conflict with British law." *Id.* (internal quotation marks omitted).

In light of the lack of conflict, the Court held that there was "no need . . . to address other considerations that might inform a decision to refrain from the exercise of jurisdiction on grounds of international comity." *Id.* Justice Scalia dissented from that part of the opinion and pointed out that "prescriptive comity" or "the practice of using international law to limit the extraterritorial reach of statutes" was "firmly established." *Id.* at 817–18 (Scalia, J., dissenting).

Since the majority did not address the "other considerations" bearing on comity, the Court's *Hartford Fire* analysis "left unclear whether it was saying that the only relevant comity factor *in that case* was conflict with foreign law . . . or whether the Court was more broadly rejecting

balancing of comity interests in *any* case where there is no true conflict." Harold Hongju Koh, *Transnational Litigation in United States Courts* 80 (2008). We think that *Hartford Fire* does *not* require proof of a "true conflict" as a prerequisite for invoking the doctrine of comity, at least in a case involving adjudicatory comity. *See id.* (concluding that since such a reading of the case "would be a much more dramatic result for the Court to have reached *sub silentio*, I am inclined to doubt that it meant to rule so broadly").

Since *Hartford Fire*, the circuits have refined the Court's "true conflict" analysis and have generally required proof of such a conflict only in cases where *prescriptive* comity is at issue—that is, where a party claims that it is subject to conflicting regulatory schemes, such as antitrust laws or bankruptcy rules that apply extraterritorially.[17]   As the Southern District of New York has observed, "[i]n post-*Hartford Fire* cases, conflict analysis has not been rigidly invoked to preclude consideration of the full range of principles relating to international comity. Rather, conflict analysis is most often applied when comity principles intersect with issues of statutory construction." *Freund v. Republic of Fr.*, 592 F. Supp. 2d 540, 574 (S.D.N.Y. 2008) (citation omitted), *aff'd sub nom. Freund v. Societe Nationale des Chemins de fer Francais*, 391 F. App'x 939 (2d Cir. 2010) (unpublished); *see also, e.g.*, *Maxwell*, 93 F.3d at 1049 (requiring a "true conflict" in a bankruptcy case).

---

[17] *See generally* Christen Broecker, *The Clash of Obligations: Exercising Extraterritorial Jurisdiction in Conformance with Transitional Justice*, 31 Loy. L.A. Int'l & Comp. L. Rev. 405, 454–56 (2009) (describing how some jurisdictions require a true conflict before triggering comity).

By contrast, the courts have *not* required proof of a true conflict—although they have considered such a conflict relevant—when considering *adjudicatory* comity. Instead, the courts have considered a range of factors when deciding whether to abstain from exercising jurisdiction due to a past or potential judicial proceeding elsewhere. *See*, *e.g.*, *Ungaro-Benages*, 379 F.3d at 1238 (determining that a true conflict was not required and examining "the strength of our government's interests in using the Foundation [established to hear claims from victims of the Nazis], the strength of the German government's interests, and the adequacy of the Foundation as an alternative forum"); *Bigio v. Coca-Cola Co.*, 448 F.3d 176, 178 (2d Cir. 2006) ("[T]he only issue of international comity properly raised here is whether adjudication of this case by a United States court would offend 'amicable working relationships' with Egypt." (citations omitted)); *JP Morgan Chase Bank*, 412 F.3d at 424 (deference to foreign adjudicatory proceedings "is appropriate so long as the foreign proceedings are procedurally fair and . . . do not contravene the laws or public policy of the United States"); *Int'l Nutrition Co. v. Horphag Research Ltd.*, 257 F.3d 1324, 1329 (Fed. Cir. 2001) ("As a general rule, comity may be granted where it is shown that the foreign court is a court of competent jurisdiction, and that the laws and public policy of the forum state and the rights of its residents will not be violated." (quotation marks and internal citation omitted)); *Freund*, 592 F. Supp. 2d at 574 ("[T]he existence of a true conflict does not bar the Court from applying the doctrine and considering other legitimate concerns implicated by United States courts exercising jurisdiction over a foreign sovereign."). *But see S. African Apartheid Litig.*, 617 F. Supp. 2d at 283 (holding true conflict analysis required in ATS suit against corporations that conducted business in apartheid South Africa).

Our own decision in *In re Simon*—a prescriptive comity case—is consistent with this pattern. There, we considered whether a bankruptcy court could sanction a foreign creditor for pursuing collection of a foreign debt that had been discharged in bankruptcy. 153 F.3d at 994. Although the creditor (HSBC) was based in Hong Kong, it had participated in the bankruptcy proceeding in the United States. *Id.* We began our analysis with a discussion of the extraterritorial application of U.S. law. *Id.* at 995. We concluded that "Congress intended extraterritorial application of the Bankruptcy Code as it applies to property of the estate." *Id.* at 996.

We then turned to whether we were "require[d]" by comity to vacate the bankruptcy court's injunction. *Id.* at 997. We noted that "[i]nternational comity in transnational insolvency proceedings must be considered in the context of bankruptcy theory." *Id.* at 998. We then explained that the Bankruptcy Code "provides for a flexible approach to international insolvencies" in which there is general "deference to the country where the primary insolvency proceeding is located." *Id.* The "sole, plenary insolvency proceeding" involving the debtor had been in the United States. *Id.* at 999. Because there were no "competing bankruptcy proceedings,"[18] and because HSBC (which was

---

[18] The dissent seizes upon this language to argue that *In re Simon* was "not merely a prescriptive comity case," but also an adjudicative-comity case. We are unconvinced. The *Simon* court emphasized the lack of "conflicting bankruptcy proceedings" in that case not because the court was conducting an adjudicative comity analysis but because that fact proved that HSBC was in no danger of being exposed to two conflicting bankruptcy schemes—a prescriptive-comity concern. The dissent's argument on this point also ignores our post-*Simon* cases—cases that are inconsistent with the dissent's reading of *Simon*. *See infra* at 45–46.

seeking to apply comity to avoid sanctions from the US bankruptcy court) had participated in the US bankruptcy proceeding and had enjoyed its benefits, we held that, under the circumstances, international comity did "not dictate a result contrary to that reached by the district and bankruptcy courts. Rather, it [wa]s consistent with the general principles of international comity which is limited to cases in which 'there is in fact a true conflict between domestic and foreign law.'" *Id.* (quoting *Hartford Fire*, 509 U.S. at 798 (quotation marks and citation omitted)).

Simply put, we do not interpret *In re Simon*—which referenced the concept of a "true conflict" in passing and in the specialized context of a bankruptcy statute that applied extraterritorially—to require proof of "true conflict" as an irreducible minimum for abstention in *all* comity cases.

Our other post-*Hartford Fire* cases also suggest that proof of "true conflict" is not a prerequisite to comity. In those cases we took account of whether there was a conflict between American and foreign law. Even when we did not find a conflict, we did not end our inquiry but moved on to consider other factors. For example, in *Metro Industries, Inc. v. Sammi Corp.*, 82 F.3d 839, 846–47 (9th Cir. 1996), we found no conflict between American and Korean law, but considered other factors to determine the reach of the Sherman Act. We looked to seven factors we had previously set out in *Timberlane Lumber Co. v. Bank of America*, 549 F.2d 597, 614 (9th Cir. 1976) ("*Timberlane I*"), for what we called "a jurisdictional rule of reason." *Id.* at 613. One of the *Timberlane I* factors was a conflict between foreign and domestic law. We noted that *Hartford Fire* overruled our holding in *Timberlane Lumber Co. v. Bank of Am.*, 749 F.2d 1378 (9th Cir. 1984) ("*Timberlane II*"), as to what "would

amount to conflict of law," but determined that *Hartford Fire* "did not question the propriety of the jurisdictional rule of reason or the seven comity factors set forth in *Timberlane I*." *Metro Indus.*, 82 F.3d at 846 n.5.

Similarly, in *In re Grand Jury Proceedings*, 40 F.3d 959, 964–65 (9th Cir. 1994), we presumed that there was a difference between a grand jury witness's rights under American law and his rights under Austrian law regarding the privacy of his Austrian bank accounts. That conflict, however was not the "true conflict" described by the Court in *Hartford Fire.* The laws of Austria and the United States did not require the witness to commit inconsistent acts; rather, he had greater privacy rights under Austrian law than American law, but it would not violate Austrian law for him to waive those rights in response to an order from a U.S. court. *Id.* at 966. Thus, the witness could "comply with the laws of both." *Hartford Fire*, 509 U.S. at 799 (quotation marks and citation omitted). Had we believed that proof of a "true conflict" was required, that fact would have ended our inquiry. It did not. Instead, we decided that "[i]n considering international comity, we balance the competing interests of Austria and the United States . . . to determine whether the purported illegality of the order under Austrian law precludes its enforcement." *In re Grand Jury Proceedings*, 40 F.3d at 965.

As our decisions in *In re Simon*, *Metro Industries*, and *In re Grand Jury Proceedings* demonstrate, we have not read *Hartford Fire* as imposing a rigid new set of requirements for finding comity. At least in cases considering adjudicatory comity, we will consider whether there is a conflict between American and foreign law as one factor in, rather than a prerequisite to, the application of comity.

Accordingly, the district court erred when it required the existence of a true conflict when it analyzed the application of international comity. And, since the district court did not identify the correct legal rule, "we must conclude it abused its discretion." *Hinkson*, 585 F.3d at 1262; *see also, e.g.*, *Perry v. Brown*, 667 F.3d 1078, 1084 (9th Cir. 2012).

Having determined that a true conflict is not always required for the application of adjudicatory comity and that the district court abused its discretion in concluding otherwise, we proceed to consider the proper framework for analyzing comity.

2.   Factors Bearing on Adjudicatory Comity

Beyond the question of true conflict, courts have struggled to apply a consistent set of factors in their comity analyses. As one commentator has observed, because there is "no clear analytical framework for its exercise, . . . courts have been left to cobble together their own approach to [international comity]." Childress III, *supra*, at 51. The district court in this case followed a three-part framework articulated by the Eleventh Circuit in *Ungaro-Benages* for the prospective application of international comity. *See Mujica I*, 381 F. Supp. 2d at 1160 (citing *Ungaro-Benages*, 379 F.3d at 1238)).[19] Under *Ungaro-Benages*' approach, a court

---

[19] The *Ungaro-Benages* court articulated different standards for "retrospective" and "prospective" claims of adjudicatory comity. "When applied retrospectively, federal courts evaluate three factors: (1) whether the foreign court was competent and used 'proceedings consistent with civilized jurisprudence,' (2) whether the judgment was rendered by fraud, and (3) whether the foreign judgment was prejudicial because it violated American public policy notions of what is decent and just." 379 F.3d at

"evaluate[s] several factors, including [1] the strength of the United States' interest in using a foreign forum, [2] the strength of the foreign governments' interests, and [3] the adequacy of the alternative forum." *Ungaro-Benages*, 379 F.3d at 1238 (citations omitted).

The *Ungaro-Benages* framework is a useful starting point for analyzing comity claims, but the case offers no substantive standards for assessing its three factors. *Ungaro-Benages* tells us to consider the respective interests of the United States and the foreign country, but it does not tell us what interests count or what makes a foreign forum adequate or inadequate. *See id.* at 1238–39. For those considerations, we may draw on our oft-cited opinion in *Timberlane I*. We note that the criteria we considered in that antitrust case[20]—which also influenced  § 403, "Limitations on Jurisdiction to Prescribe" of the Restatement (Third) of

1238 (citation omitted).  We find it unnecessary to draw a distinction between retrospective and prospective comity in this case.

[20] *Timberlane I* articulated seven elements courts should weigh:

> [1] the degree of conflict with foreign law or policy, [2] the nationality or allegiance of the parties and the locations or principal places of businesses or corporations, [3] the extent to which enforcement by either state can be expected to achieve compliance, [4] the relative significance of effects on the United States as compared with those elsewhere, [5] the extent to which there is explicit purpose to harm or affect American commerce, [6] the foreseeability of such effect, and [7] the relative importance to the violations charged of conduct within the United States as compared with conduct abroad.

549 F.2d at 614.

Foreign Relations Law,[21] *see* Koh, *supra*, at 66—are better adapted to the commercial context. Nevertheless, these factors help provide us with a general list of indicia to which we may look when weighing U.S. and foreign interests and the adequacy of the alternative forum.

### a.   U.S. interests

The (nonexclusive) factors we should consider when assessing U.S. interests include (1) the location of the conduct in question, (2) the nationality of the parties, (3) the character

---

[21] The Restatement lists a number of considerations for determining whether the exercise of jurisdiction is "unreasonable," including:

> (a) the link of the activity to the territory of the regulating state, i.e., the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory; (b) the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect; (c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted[;] (d) the existence of justified expectations that might be protected or hurt by the regulation; (e) the importance of the regulation to the international political, legal, or economic system; (f) the extent to which the regulation is consistent with the traditions of the international system; (g) the extent to which another state may have an interest in regulating the activity; and (h) the likelihood of conflict with regulation by another state.

Restatement (Third) of Foreign Relations Law § 403(2) (1987).

of the conduct in question, (4) the foreign policy interests of
the United States, and (5) any public policy interests. When
some or all of a plaintiff's claims arise under state law, the
state's interests, if any, should be considered as well. The
doctrine of comity is particularly concerned with "sovereign
interests," Childress III, *supra*, at 61–62, and the sovereign
whose interests are relevant when a federal court is hearing
state-law claims is as much the individual state—whose law
the federal court must faithfully apply—as the United
States.[22] *Cf. Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78
(1938). *See generally* Restatement (Third) of Foreign
Relations Law § 403(2)(c) (courts considering whether
jurisdiction is reasonable should assess "the importance of
regulation *to the regulating state*" (emphasis added)). We
caution, however, that in cases of this kind there is always a

---

[22] It bears mentioning that a state's interest will not necessarily be in the
application of its own law to a case. Here, for example, although
Plaintiffs pled California causes of action, if the case were to proceed to
litigation, the district court would follow California's conflict-of-laws
methodology, which calls for a governmental-interest analysis. *See
Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). That
analysis could favor the application of Colombia's law rather than
California's. *See, e.g.*, *Arno v. Club Med, Inc.*, 22 F.3d 1464, 1468 (9th
Cir. 1994) (under California's governmental-interest analysis, French law,
rather than California law, applied to plaintiff's tort claims against former
employer and supervisor); *McGhee v. Arabian Am. Oil Co.*, 871 F.2d
1412, 1422–26 (9th Cir. 1989) (Saudi law, rather than California law,
applied to plaintiffs' state-law claims against employer); *Tucci v. Club
Mediterranee, S.A.*, 89 Cal. App. 4th 180, 194 (Ct. App. 2001)
(Dominican Republic law, rather than California law, applied to tort and
worker's compensation claims); *Hernandez v. Burger*, 102 Cal. App. 3d
795, 804 (Ct. App. 1980) (Mexican law, rather than California law,
applied to personal-injury claims arising out of auto accident in Mexico).
Thus, in stating that a court sitting in diversity should consider the state's
interests, we mean to refer primarily to the state's interest, if any, in
providing a *forum* or *remedy* for particular claims.

risk that "our foreign relations could be impaired by the application of state laws, which do not necessarily reflect national interests." *Ungaro-Benages*, 379 F.3d at 1232–33. Out of regard for that risk, we should be careful not to give undue weight to states' prerogatives.

We will discuss each of the foregoing factors in turn.

First, comity is most closely tied to the question of territoriality. We should consider where the conduct in question took place. This is a critical question in determining the extraterritorial reach of U.S. statutes, *see Kiobel*, 133 S. Ct. at 1663–65; *Arabian Am. Oil*, 499 U.S. at 248, and it is a relevant consideration in adjudicatory comity as well. The general presumption against extraterritorial application of U.S. law recognizes that "United States law governs domestically but does not rule the world." *Microsoft*, 550 U.S. at 454. Comity similarly rests on respect for the legal systems of members of the international legal community—a kind of international federalism—and thus "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *Arabian Am. Oil*, 499 U.S. at 248.

Not surprisingly, U.S. courts have afforded far less weight, for comity purposes, to U.S. or state interests when the activity at issue occurred abroad. *See Torres v. S. Peru Copper Corp.*, 965 F. Supp. 899, 909 (S.D. Tex. 1996) (dismissing action under comity where the "activity and the alleged harm occurred entirely in Peru [and] Plaintiffs are all residents of Peru"), *aff'd*, 113 F.3d 540 (5th Cir. 1997); *Sequihua v. Texaco, Inc.*, 847 F. Supp. 61, 63 (S.D. Tex. 1994) (declining jurisdiction under comity where challenged activity occurred entirely in Ecuador); *see also Chowdhury v.*

*Worldtel Bangl. Holding, Ltd.*, 746 F.3d 42, 49 (2d Cir. 2014) (reversing lower court and foreclosing jurisdiction over ATS claims filed by Bangladeshi plaintiff allegedly detained and tortured by Bangladeshi authorities in Bangladesh). *See generally* Koh, *supra*, at 18–19, 51–57 (describing courts' aversion to adjudicating extraterritorially as rooted in principle of national sovereignty).

Second, we should take account of whether any of the parties are United States citizens or nationals, and also whether they are citizens of the relevant state. *See Jota v. Texaco, Inc.*, 157 F.3d 153, 155 (2d Cir. 1998) (vacating dismissal, on forum non conveniens, comity, and failure to join indispensable party grounds, of action by Ecuadorians against American oil company for injuries that allegedly resulted from action in Ecuador); *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 556–57 (9th Cir. 1992) (holding that U.S. courts have jurisdiction where some parties were U.S. corporations and U.S. persons and other non-nationals had substantial contacts with the United States). As we previously discussed in the context of the ATS, even if the presence of U.S. nationals as defendants does not establish jurisdiction in this country on its own, it can, as we have noted, contribute to a finding that there is a "nexus" between the United States and the parties and claims in a case. *See supra*; *see also, e.g.*, *Sarei v. Rio Tinto PLC ("Sarei III")*, 650 F. Supp. 2d 1004, 1016 (C.D. Cal. 2009), *aff'd in part, rev'd in part and remanded*, 671 F.3d 736 (9th Cir. 2011), *cert. granted, judgment vacated sub nom. Rio Tinto PLC v. Sarei*, 133 S. Ct. 1995 (2013) and *aff'd*, 722 F.3d 1109 (9th Cir. 2013).

*Kiobel* and the lower-court decisions that have followed in its wake confirm the importance of these first two factors

to courts' jurisdictional analyses in cases involving international events. While *Kiobel* and its progeny specifically address the interpretation of a *statute*—the ATS—and not the prudential international comity doctrine, the guiding principle of those cases applies equally in the context of adjudicatory comity: the weaker the nexus between the challenged conduct and U.S. territory or U.S. parties, the weaker the justification for adjudicating the matter in U.S. courts and applying U.S. federal or state law.

The third factor we should consider bearing on U.S. interests is the nature of the conduct in question. We should ask whether the action is civil or criminal; whether it sounds in tort, contract, or property; and whether the conduct is a regulatory violation or is a violation of international norms against torture, war crimes, or slavery. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 731–33 (2004); *Filartiga v. Pena-Irala*, 630 F.2d 876, 890 (2d Cir. 1980). These inquiries may inform our judgment of the importance of the issue to the United States or to an individual state. The closer the connection between the conduct and core prerogatives of the sovereign, the stronger that sovereign's interest. For example, in *Timberlane I*, which was an antitrust case, we considered "the relative significance of effects on the United States as compared with those elsewhere, the extent to which there is explicit purpose to harm or affect American commerce, . . . and the relative importance to the violations charged of conduct within the United States as compared with conduct abroad." *Timberlane I*, 549 F.2d at 614.

Fourth, we must take cognizance of the foreign policy interests of the United States. As we do when applying the political question, act of state, and foreign affairs doctrines, we must respect the Constitution's commitment of the foreign

affairs authority to the political branches. U.S. Const. art. I, § 8, cl. 3 ("The Congress shall have Power . . . To regulate Commerce with foreign Nations"); art. II, § 2 ("[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties . . . and he . . . shall appoint Ambassadors, other public Ministers and Consuls); art. II, § 3 ("[The President] shall receive Ambassadors and other public Ministers"). *See Garamendi*, 539 U.S. at 413–15; *Japan Line, Ltd. v. Cnty. of Los Angeles*, 441 U.S. 434, 449 (1979); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427 (1964); *Baker*, 369 U.S. at 211.

Courts have found that U.S. interests weigh against hearing cases where doing so would be harmful to U.S. foreign policy. *See Hwang Geum Joo v. Japan*, 413 F.3d 45, 52 (D.C. Cir. 2005) (dismissing as nonjusticiable ATS claims brought by Korean women in light of U.S government's argument that "adjudication by a domestic court not only would undo a settled foreign policy of state-to-state negotiation with Japan, but also could disrupt Japan's delicate relations with China and Korea, thereby creating serious implications for stability in the region" (internal quotation marks omitted)); *Ungaro-Benages*, 379 F.3d at 1239 (abstaining in light of strong foreign policy interest in promoting settlement of Nazi-era claims through government-backed forum); *O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A.*, 830 F.2d 449, 451 (2d Cir. 1987) (affirming dismissal where district court concluded that U.S.-Colombian relations would likely suffer if U.S. litigation proceeded in light of foreign state's "strong interest" in relevant protectionist legislation and ownership interest in defendant). This deference is rooted, in part, in separation of power concerns. *See Christopher v. Harbury*, 536 U.S. 403, 417 (2002) (dismissing claim by Guatemalan widow alleging

federal officers concealed information about her husband's fate and holding that "if there is to be judicial enquiry, it will raise concerns for the separation of powers in trenching on matters committed to the other branches").

Fifth, we may also weigh U.S. public policy interests, and those of the relevant state to a lesser extent, for "courts will not extend comity to foreign proceedings when doing so would be contrary to the policies . . . of the United States." *Pravin*, 109 F.3d at 854. For example, we have held that there is a strong U.S. interest justifying U.S. jurisdiction in "preventing trademark violations," *Reebok Int'l*, 970 F.2d at 556, and we have spoken of the strong U.S. policy favoring enforcement of arbitration and forum selection clauses. *See Dependable Highway Exp. v. Navigators Ins. Co.*, 489 F.3d 1059, 1068–69 (9th Cir. 2007). The Second Circuit has also refused to extend international comity to a foreign state's debt negotiations as contrary to American policy because the United States "encourages participation in, and advocates success of" such debt resolution procedures, and the United States "has a strong interest in ensuring the enforceability of valid debts . . . owed to United States lenders." *Pravin*, 109 F.3d at 855.

We have treated differences in legal approach cautiously, however. Even when foreign practices may differ from American ones, we will respect those differences so long as the variance does not violate strongly-held state or federal public policy. *See Belize Telecom, Ltd. v. Gov't of Belize*, 528 F.3d 1298, 1307 (11th Cir. 2008) (holding that decision allowing Government of Belize to remove directors of telecom company did not "violate[] American public policy" where decision "merely g[ave] effect to the plain language"

of corporate articles of incorporation, which were interpreted under Belizean law).

### b. Foreign interests

The proper analysis of foreign interests essentially mirrors the consideration of U.S. interests. Foreign states, no less than the United States, have legitimate interests in regulating conduct that occurs within their borders, involves their nationals, impacts their public and foreign policies, and implicates universal norms. *See Mich. Cmty. Servs., Inc. v. NLRB*, 309 F.3d 348, 356 (6th Cir. 2002).

Accordingly, courts have considered the territoriality of the questioned activity, its effects, the nationality of the parties, and the interests of the foreign state when deciding whether to exercise jurisdiction. *See Jota*, 157 F.3d at 160 (holding that deference to foreign state's position on matters that took place within its territory is "inherent in the concept of comity"); *see also Sequihua*, 847 F. Supp. at 62 (declining jurisdiction in part because of Ecuador's "official[]" protest that the litigation "will do 'violence' to the international legal system").

To illustrate, in *Bi*, the Second Circuit held that individual victims of the Bhopal gas leak disaster in India, which harmed almost exclusively Indians, did not have standing to challenge a settlement reached between India and the company responsible for the tort in light of an Indian law granting the Indian government exclusive standing to represent victims of the disaster. 984 F.2d at 586 (declining "to pass judgment on the validity of India's response to a disaster that occurred within its borders" because doing so "would disrupt our relations with that country and frustrate

the efforts of the international community to develop methods to deal with problems of this magnitude in the future"); *see also, e.g.*, *Freund*, 592 F. Supp. at 578 (declining jurisdiction where "Plaintiffs' claims [we]re inextricably connected to France").

### c. The adequacy of the forum

The interests of the United States and the foreign government must be evaluated in light of the adequacy of the foreign forum. When it comes to the adequacy of the forum, courts consider decisions rendered by the alternative forum and ask "'(1) whether the judgment was rendered via fraud; (2) whether the judgment was rendered by a competent court utilizing proceedings consistent with civilized jurisprudence; and (3) whether the foreign judgment is prejudicial [and] . . . repugnant to fundamental principles of what is decent and just.'" *Belize Telecom*, 528 F.3d at 1306 (quoting *Turner Entm't Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1519 (11th Cir. 1994)). Typically, courts ask whether one side has presented specific evidence that the judgment of the alternative forum was significantly inadequate. *See id.* ("In this case, neither party has argued that the Belizean judgments were rendered via fraud or that the Belizean proceedings lacked any element of civilized jurisprudence.").

The Second Circuit, for example, has held that deference to the judgment of a "foreign court is appropriate so long as the foreign proceedings are procedurally fair and . . . do not contravene the laws or public policy of the United States." *JP Morgan Chase Bank*, 412 F.3d at 424. In that case, the court deferred to the jurisdiction of the Mexican courts even though there was a six-year delay in resolving the litigation, since such a delay did not result in "manifest injustice" or violate

"fundamental standards of procedural fairness." *Id.* at 428 (internal quotation marks omitted); *see also Jota*, 157 F.3d at 160 ("When a court dismisses on the ground of comity, it should normally consider whether an adequate forum exists in the objecting nation and whether the defendant sought to be sued in the United States forum is subject to or has consented to the assertion of jurisdiction . . . in the foreign forum."); *U.S. ex rel. Saroop v. Garcia*, 109 F.3d 165, 170 (3d Cir. 1997) (invoking comity to defer to foreign court on validity of extradition treaty absent assertion that foreign state failed to follow regular judicial proceedings, engaged in prejudicial or fraudulent practices, or refused to extend deference to United States' judicial findings).[23]

We are justly proud of our legal system. But we recognize that there are other legal systems that have effected, in different ways, our constitutional values of separation of powers, due process of law, and the equal protection of the law. Comity, as the "golden rule among nations," compels us to "give the respect to the laws, policies and interests of others that [we] would have others give to [our] own in the same or similar circumstances." *Mich. Cmty. Servs., Inc.*, 309 F.3d at 356 (internal quotation marks omitted).

---

[23] Our decision in the context of the Hague Convention on the Civil Aspects of International Child Abduction is not contrary to these principles. In *Asvesta v. Petroutsas*, 580 F.3d 1000 (9th Cir. 2009), we held that a Greek court's decision that a child's mother had not wrongly retained a child was not entitled to comity because the Greek court clearly misapplied the provisions of the Hague Convention, completely failed to determine the child's habitual residence, as required by the Hague analysis, and made no factual findings to support its determination that the father had failed to exercise custody rights. *Id.* at 1016–17.

Accordingly, we proceed under the *Ungaro-Benages* framework as we have elaborated it from the case law, mindful that comity is circumstance-dependent and not susceptible to mechanical application. "Since comity varies according to the factual circumstances surrounding each claim for its recognition, the absolute boundaries of the duties it imposes are inherently uncertain." *Laker Airways*, 731 F.2d at 937.

## B. *Analysis*

### 1. U.S. Interests

At first blush, the United States's interests in this case appear to be mixed. On the one hand, as we have explained, the conduct complained of—Occidental and AirScan's alleged cooperation with the CAF in the bombing at Santo Domingo—took place entirely in Colombia. Plaintiffs have not adequately pled any factual matter suggesting that any planning or operations took place in the United States. All the Plaintiffs, moreover, are or were Colombian citizens and residents at the time of the bombings. *Cf. Balintulo*, 727 F.3d at 189. On the other hand, the United States has an interest in upholding international human rights norms, and Plaintiffs allege that Defendants' actions violated international norms in several respects. *See Sarei III*, 650 F. Supp. 2d at 1020–21. Occidental and AirScan, moreover, are U.S.-chartered corporations, with Occidental a citizen of California, and the United States has manifested some level of interest in the good behavior of its corporate citizens abroad, *see*, *e.g.*, Foreign Corrupt Practices Act, 15 U.S.C. § 78dd–1, although the United States does not monitor or regulate *all* the behavior of its citizens, natural or corporate,

overseas. *See Microsoft Corp.*, 550 U.S. at 454; *Morrison*, 547 F.3d 167, 174 (2d Cir. 2008).

The United States, however, has spoken directly on the question of its interests in this case. The district court particularly credited the State Department's Supplemental SOI and concluded it was "strong evidence that the United States, in the interest of preserving its diplomatic relationship with Colombia, prefers that the instant case be handled exclusively by the Colombian justice system." *Mujica I*, 381 F. Supp. 2d at 1161. The SOI, dated December 23, 2004, articulated several reasons why "the State Department believes that the adjudication of this case will have an adverse impact on the foreign policy interests of the United States." First, it referenced the related actions which were then ongoing in Colombia against the Colombian government and military personnel regarding the incident. It noted that the American companies that are the subject of the instant suit were not then subject to the suits in the Colombian courts, but it added that Occidental had stipulated to service and consented to jurisdiction in Colombia.

Second, the State Department wrote that it "believe[d] that foreign courts generally should resolve disputes arising in foreign countries, where such courts reasonably have jurisdiction and are capable of resolving them fairly. An important part of our foreign policy is to encourage other countries to establish responsible legal mechanisms for addressing and resolving alleged human rights abuses." It warned that the instant case could give the impression that the U.S. government "does not recognize the legitimacy of Colombian judicial institutions" and that those "perceptions could potentially have negative consequences for our bilateral relationship with the Colombian government." The State

Department praised Colombia as one of the United States' "closest allies in this hemisphere," and it warned that lawsuits like this one "have the potential for deterring present and future U.S. investment in Colombia." Finally, the letter explained that "reduced U.S. investment in Colombia's oil industry" might, in turn, "detract from the vital U.S. policy goal of expanding and diversifying our sources of imported oil."

The United States reiterated these interests in its amicus brief during the initial appeal. It wrote that "the particular foreign policy interests identified by the United States' Supplemental Statement of Interest warrant dismissal of the litigation under the doctrine of international comity." The amicus brief went on to argue that the "district court properly recognized the 'substantial interest' of the United States and the 'strong interest' of our regional ally, Colombia, in having the lawfulness of military action reportedly taken by Colombian military officials in the course of fighting insurgents in that country adjudicated exclusively in Colombian courts." It also noted the favorable judgment the victims of the attack received from the Colombian government that was then on appeal and has now been affirmed. There is nothing to suggest that the State Department has since changed its views.

The Supreme Court has said that "should the State Department choose to express its opinion on the implications of exercising jurisdiction over *particular* petitioners in connection with *their* alleged conduct, that opinion might well be entitled to deference as the considered judgment of the Executive on a particular question of foreign policy." *Republic of Austria v. Altmann*, 541 U.S. 677, 702 (2004); *see Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57, 74

(2d Cir. 2005) (crediting U.S. government's expression of interests when dismissing as nonjusticiable under the political question doctrine claims brought against Austria).

That guidance is particularly apt here. This is not a case in which the State Department has issued no SOI or an equivocal SOI and the United States' position might be less entitled to deference. *See, e.g.*, *Gross*, 456 F.3d at 389–90 (declining to defer to U.S. government's preference where "the United States Executive has taken no position on the merits of this dispute, and has not promised dismissal or intervention."). Here, the State Department asked for the case to be dismissed, first by strong implication in the SOI, and then explicitly in its amicus brief, which urged the affirmance of the district court's judgment of dismissal. Accordingly, we "give serious weight to the Executive Branch's view of [this] case's impact on foreign policy," *Sosa*, 542 U.S. at 733 n.21, and we conclude that the United States' interest in having the case adjudicated exclusively in Colombia is strong.

California's interest in this case weighs somewhat more in favor of our adjudicating Plaintiffs' claims than does the United States' national interest. We have previously acknowledged, for example, that California has a "significant interest in providing a forum for those harmed by the actions of its corporate citizens." *Carijano*, 643 F.3d at 1232. But this interest is a general interest in good corporate behavior[24]

---

[24] Were California to manifest a specific interest in redressing claims arising out of the Santo Domingo incident or in Colombia's drug wars more generally, its interests could well be preempted by the political branches' foreign affairs power. "'[E]ven in [the] absence of a treaty" or federal statute, a state may violate the constitution by 'establish [ing] its own foreign policy.'" *Deutsch v. Turner Corp.*, 324 F.3d 692, 709 (9th Cir. 2003) (quoting *Zschernig v. Miller*, 389 U.S. at 441); *see also*

and should not be overstated, given that Plaintiffs are not California citizens, that their claims concern events that occurred abroad, and that one Defendant (AirScan) is not a California resident corporation. *See Saleh v. Titan Corp.*, 580 F.3d 1, 12 (D.C. Cir. 2009) (commenting, in state-law tort case brought against by foreign plaintiffs and arising out of events in foreign country, that "the interests of any U.S. state . . . are *de minimis* in this dispute"). In any event, California's interest in having this case adjudicated here scarcely outweighs the United States' unambiguous preference to the contrary. As the Supreme Court has stated, "[t]here is . . . no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy." *Garamendi*, 539 U.S. at 413–14. In light of the forcefully expressed views of the State Department, we conclude that that point has clearly been reached in this case.

### 2. Colombian Interests

We next consider the strength of Colombia's interest in litigating the matter. *See Ungaro-Benages*, 379 F.3d at 1238. As in *Bi*, the activity here occurred exclusively within the territory of a foreign state and involved solely foreign victims. 984 F.2d at 586. Although Defendants are U.S. corporations, the district court correctly concluded that "Colombia has a strong interest in preventing this Court's jurisdiction over the instant case." *Mujica I*, 381 F. Supp. 2d at 1162. The court came to that conclusion after considering one of the two démarches from the Colombian Ministry of Foreign Affairs that were attached to the SOI. *Id.* Both

---

*Garamendi*, 539 U.S. at 396; *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1071–72 (9th Cir. 2012).

démarches referenced, by case number, the instant matter's district court litigation. The first démarche, dated February 25, 2004, informed the U.S. Embassy in Bogota that "the Colombian judiciary in accordance with the principle of territoriality" was investigating the Santo Domingo bombing and assessing "the responsibility of agents of the Colombian Government" who were involved in it. The second démarche, dated March 12, 2004, stated simply: "The Ministry of Foreign Affairs wishes to add that the Government of Colombia is of the opinion that any decision in this case may affect the relations between Colombia and the US." While the second démarche did not explain why Colombia holds this position, the SOI surmised that Colombia had a strong interest in avoiding duplicative litigation that "may be seen as unwarranted and intrusive" or would show disrespect for the "legitimacy of Colombian judicial institutions." In any event, as the district court observed, the Colombian government does not have "to explain itself to a federal court." *Mujica I*, 381 F. Supp. 2d at 1162.

Although Colombia's position is not detailed, "inherent in the concept of comity is the desirability of having the courts of one nation accord deference to the official position of a foreign state, at least when the position is expressed on matters concerning actions of the foreign state taken within or with respect to its own territory." *Jota*, 157 F.3d at 160. Here, Colombia has done exactly that—it has taken a specific position on an incident that occurred within its territory involving its nationals. *See also Freund*, 592 F. Supp. 2d at 578 (crediting the official position of both the United States and France that France should be the "exclusive" forum for addressing plaintiffs claims where the underlying act occurred in France).

This situation thus stands in clear contrast to other cases where a foreign state did not express an interest in having its courts serve as a forum for relevant litigation. *See Abad v. Bayer Corp.*, 563 F.3d 663, 668 (7th Cir. 2009) ("[N]either [Argentina nor the United States] appears to have any interest in having the litigation tried in its courts rather than in the courts of the other country; certainly no one in the government of either country has expressed to us a desire to have these lawsuits litigated in its courts."); *Pacheco de Perez v. AT&T Co.*, 139 F.3d 1368, 1378 (11th Cir. 1998) ("[W]e think it significant . . . that the Venezuelan government has taken no position on whether this lawsuit proceeds in the United States or Venezuela.").

Under the comity doctrine, we seek "to foster international cooperation and encourage reciprocal recognition of U.S. judgments in foreign courts." *United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 8 (D.D.C. 2013) (citing *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 304 (1918) ("To permit the validity of the acts of one sovereign state to be reexamined and perhaps condemned by the courts of another would very certainly imperil the amicable relations between governments and vex the peace of nations.")).

Accordingly, we find that Colombia's interest in serving as the exclusive forum for this litigation is strong.

### 3.   Adequacy of the Colombian Forum

Finally, we turn to the adequacy of the foreign forum. *Ungaro-Benages*, 379 F.3d at 1238. The district court (Judge Rea) originally reasoned that "federal courts will not review foreign judgments unless the parties challenging that

judgment demonstrate that it was unfair." *Mujica I*, 381 F. Supp. 2d at 1163 (citing *Hilton*, 159 U.S. at 202–03). It held that the showing of an "adequate alternative forum" was a "*necessary* condition to apply the doctrine of international comity." *Id.* It then concluded that Colombia was an inadequate forum because Colombian law would not permit a second recovery in addition to the judgment Plaintiffs won against the Colombian government in *Mario Galvis Gelves, et al. v. The Nation*. *See id.* at 1147–48.

On remand in 2010, we directed the district court (Judge Wu) to consider the prudential exhaustion issue and the effect of the *Galvis Gelves* and *Romero Pradilla* matters, a directive which necessarily required it to reevaluate the adequacy of the alternative forum. With the benefit of the subsequent Colombian decisions, Judge Wu came to a different conclusion than Judge Rea.

As an initial matter, Judge Wu applied a burden-shifting standard: once a defendant shows that a foreign forum would have jurisdiction and would provide a remedy for a meritorious claim, the party "asserting inadequacy or delay must make a powerful showing." *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1179 (9th Cir. 2006); *see also Carijano v. Occidental Petroleum, Corp.*, 643 F.3d 1216, 1225 (9th Cir. 2011) (holding Peru provided an adequate alternative forum in action brought by members of Peruvian indigenous group and California nonprofit against petroleum company for environmental contamination).[25]

---

[25] These cases determined the adequacy of the alternative forum for *forum non conveniens* purposes, although this analysis is "equally pertinent to dismissal on the grounds of comity." *Jota*, 157 F.3d at 160; *see also Ford v. Brown*, 319 F.3d 1302, 1304 n.3 (11th Cir. 2003) (noting

Under this standard, the district court held that "Occidental seems to have met its initial burden of showing the availability of local remedies." In particular, Occidental had consented to jurisdiction in Colombia, and Plaintiffs could have proceeded in a separate suit against Defendants in Colombia at the time of their initial Colombian litigation. The court reviewed Plaintiffs' assertion that they could not practically have brought suit in Colombia because they feared physical danger and had fled. The court noted that Occidental "at least refuted some of Plaintiffs' contentions regarding the threats to their physical safety." It found that Plaintiffs had "pursue[d] a suit in Colombia for years, [had] filed court papers in Colombia with names, addresses, and telephone numbers, and [that] two of the Plaintiffs [had] posed for photos in connection with a 2003 newspaper interview in Colombia." The court cited evidence in the record that showed that Plaintiffs could have filed their case directly in Bogota if they felt unsafe in Santo Domingo. It also noted that Plaintiffs did not have to be physically present in Colombia to pursue litigation against Defendants. The court concluded that Plaintiffs had not made a "powerful showing" that the foreign forum would be inadequate. Accordingly, "[i]f exhaustion were required, Occidental would probably prevail on its demonstration of availability of local remedies and the lack of futility." The court concluded that prudential exhaustion was not required in the case but that, if it were to impose such a requirement, "it would find that Defendant Occidental ha[d] met its burden of pleading and proving the availability of local remedies and Plaintiffs' failure to exhaust them."

---

that comity and *forum non conveniens* calculuses are "ultimately intertwined").

We credit Judge Wu's finding of adequacy as superseding the earlier, contrary finding.[26] Defendants, in their previous filings and again before us, have averred that they are available for service of process and would waive any statute of limitations claims if Plaintiffs were to bring action against them in Colombian courts.[27] And "Occidental's 'voluntary submission to service of process' suffices to meet the first

---

[26] The dissent takes us to task for our reliance on Judge Wu's findings, dismissing Judge Wu's determination of adequacy as "merely dictum" and the findings of a "substitute district judge." But while we acknowledge that Judge Wu's analysis was not addressed to the international comity doctrine, as Judge Rea's was, we cannot accept the dissent's contention that we should therefore privilege Judge Rea's findings, which were based on a less complete record. Judge Wu was able to take into account new and important information that was unavailable to Judge Rea—namely, the subsequent developments in the Colombian proceedings—and his opinion is a valuable source of insight on this issue. The dissent does not and cannot offer any persuasive reason for ignoring Judge Wu's opinion.

[27] The dissent dismisses these statements, arguing that there is "no basis" for the idea that Defendants would actually have submitted to jurisdiction in Colombia if they had been joined in the litigation there. But there is ample reason why they might have done so. Civil defendants often make such concessions in cases where they face a choice between litigating in an inconvenient and unattractive forum in the United States or a convenient forum abroad. *See, e.g.*, *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 242 (1981) (in case involving airplane crash in Scotland, defendants "agreed to submit to the jurisdiction of the Scottish courts and to waive any statute of limitations defense that might be available"); *Loya v. Starwood Hotels & Resorts Worldwide, Inc.*, 583 F.3d 656, 664 (9th Cir. 2009) (holding that Mexico was an adequate forum for *forum non conveniens* purposes, where "all defendants agreed to accept service, submit to [Mexican] jurisdiction, and waive any statute of limitations defenses"). Had Defendants resisted jurisdiction in Colombia, they would have substantially weakened their position with respect to issues such as *forum non conveniens* and international comity if they were subsequently sued in the United States.

requirement for establishing an adequate alternative forum." *Carijano*, 643 F.3d at 1225 (quoting *Tuazon*, 433 F.3d at 1178); *see also Bigio*, 239 F.3d at 454 (suggesting that the existence of an alternate forum, and defendant's amenability to suit in foreign jurisdiction, should be considered in comity analysis).

Considering the significant success Plaintiffs have had in litigation against the Colombian government and the convictions Colombia secured against the individuals responsible for the Santo Domingo bombing, Plaintiffs have not made a "powerful showing" that the Colombian forum is "clearly unsatisfactory." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n. 22 (1981) (noting such a circumstance is "rare"); *see Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1144 (9th Cir. 2001) ("The effect of *Piper Aircraft* is that a foreign forum will be deemed adequate unless it offers no practical remedy for the plaintiff's complained of wrong."). To the contrary, the Colombian legal system addressed the Santo Domingo incident in two ways: through criminal sanctions and civil reparations.

Relying on the expert testimony in the record, we conclude that Plaintiffs could have originally sued Defendants in Colombia when they sued the government, but they chose not to do so. Plaintiffs pursued litigation against the Colombian government despite fears of physical danger and, even conceding Plaintiffs' legitimate fears, they "have not shown that their 'physical presence in [Colombia] is required to pursue the civil action." *Argueta v. Banco Mexicano, S.A.*, 87 F.3d 320, 327 (9th Cir. 1996).

Nor is there anything in the record to suggest that the Colombian courts' decisions resulted in "manifest injustice"

or violated "fundamental standards of procedural fairness." *JP Morgan Chase Bank*, 412 F.3d at 428; *see also LG Display Co. Ltd. v. Obayashi Seikou Co., Ltd.*, 919 F. Supp. 2d 17, 30–31 (D.D.C. 2013) (holding that a judgment is repugnant to U.S. policy, such that it may be denied comity, only if it tends to undermine the public interest, the public confidence in the administration of the law, or security for individual rights of personal liberty or of private property); *Collins v. Oilsands Quest, Inc.*, 484 B.R. 593, 597 (S.D.N.Y. 2012) ("[A] foreign judgment should generally be accorded comity if its proceedings are 'fair and impartial.'").

In light of Plaintiffs' substantial victory against the Colombian government, they are barred by Colombian law from a secondary recovery from Defendants. But Colombia's single-recovery rule does not render the forum inadequate. *See Piper Aircraft Co.*, 454 U.S. at 254–55 (noting that a forum can be adequate even where there is the potential for a smaller damage award); *Ungaro-Benages*, 379 F.3d at 1239 ("The [alternative forum] offers victims of the Nazi era adequate remedy, even if [it] cannot provide as substantial an award as American courts."); *Gonzalez v. Chrysler Corp.*, 301 F.3d 377, 381–82 (5th Cir. 2002) (invoking comity to hold that Mexican courts are not inadequate under doctrine of *forum non conveniens* because cap on damages effectively bars lawsuit for wrongful death of a child); *see also Bi*, 984 F.2d at 586 (deferring to Indian jurisdiction addressing mass tort); *cf. Freund*, 592 F. Supp. 2d at 576 (holding alternate forum adequate even though "[n]o amount of money can possibly be fair under [these] circumstances" (alterations in original) (internal citation omitted)).

Any lack of a remedy against Defendants thus stems from Plaintiffs' failure to sue Defendants in Colombia rather than

from the inadequacy of the Colombian legal system. We note, in this regard, that American jurisdictions regularly apply single-recovery rules in other circumstances without violating fundamental standards of procedural fairness. *See, e.g.*, *Duran v. Town of Cicero, Ill.*, 653 F.3d 632, 642 (7th Cir. 2011) ("A judgment that can be read to allow a plaintiff to recover twice [from different defendants] for the same injury contains a manifest error of law."); *Vesey v. United States*, 626 F.2d 627, 633 (9th Cir. 1980) ("The general theory of compensatory damages bars double recovery for the same wrong. The principal situation is where joint or concurrent tortfeasors are jointly and severally liable for the same wrong. Only one complete satisfaction is permissible, and, if partial satisfaction is received from one, the liability of others will be correspondingly reduced" (internal quotation marks omitted)).

In sum, because of the strength of the U.S. government's interest in respecting Colombia's judicial process, the weakness of California's interest in this case, the strength of Colombia's interests in serving as an exclusive forum, and the adequacy of the Colombian courts as an alternative forum, we conclude that all of the claims before us are nonjusticiable under the doctrine of international comity. *See Ungaro-Benages*, 379 F.3d at 1239.

The crimes Plaintiffs allege are abominable, but the facts of this case nonetheless favor applying adjudicatory comity. Both nations have explicitly requested that our courts abstain from adjudicating a matter that was already litigated in Plaintiffs' favor in an adequate alternative forum. The United States has articulated a strong interest in respecting the judicial process of Colombia and furthering the development of the rule of law there. The Colombian courts have shown

themselves willing to vindicate Plaintiffs' legitimate claims against that country's government for its military's acts, and the government has proven itself both willing and able to hold the individuals responsible for the bombing to account, as the *Galvis Gelves* and *Romero Pradilla* litigation show. Thus, our forbearance in this circumstance is "consistent with those notions of comity that lead each nation to respect the sovereign rights of other nations by limiting the reach of its laws and their enforcement." *Sosa*, 542 U.S. at 761 (Breyer, J., concurring).

## VI. CONCLUSION

We affirm the district court's judgment. We do not reach any of the other issues raised on this appeal.

**AFFIRMED.**

---

ZILLY, Senior District Judge, concurring in part and dissenting in part:

For over 11 years, plaintiffs[1] have been seeking justice in our courts for the role that two U.S. corporations allegedly played in atrocities committed in the Republic of Colombia. On December 13, 1998, one or more cluster bombs were dropped from a Colombian Air Force helicopter onto the

---

[1] Plaintiffs Luis Alberto Galvis Mujica ("Luis") and John Mario Galvis Mujica are brothers; plaintiff Mario Galvis Gelvez is their father. Certain of their claims, namely the claim under Cal. Bus. & Prof. Code §§ 17200 & 17204, and Luis's tort claims, were dismissed as time barred. Plaintiffs have not challenged such rulings on appeal.

village of Santo Domingo, killing 17 unarmed civilians, including six children, and wounding 25 others. Plaintiff Mario Galvis Gelvez ("Galvis") was seriously injured in the raid, and his wife, daughter, and niece were among the massacred. Although the pilot and co-pilot of the helicopter were convicted of murder and sentenced to 30 years in prison, plaintiff Galvis received only $55,800, and each of his sons received only $21,762, in "symbolic" compensation from the Colombian government. To date, defendant Occidental Petroleum Corporation ("Occidental"), a California corporation, and defendant AirScan, Inc. ("AirScan"), a Florida corporation, have not been required to answer for their alleged participation in the planning and execution of the attack on Santo Domingo.

Instead, plaintiffs' claims against these U.S. corporations, brought pursuant to the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, were dismissed on improper grounds, and their appeal from this erroneous decision has been unreasonably delayed for close to a decade.[2] Unfortunately, plaintiffs' long ordeal might now end with the majority affirming the dismissal of plaintiffs' ATS claims by relying on a distinguishable Supreme Court decision, *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013), announced almost eight years after the district court granted defendants' Rule 12(b)(6) motion. The majority also affirms the

---

[2] A prior panel of this Court remanded the matter for the district court to "consider whether a prudential exhaustion requirement applies in this case." On remand, the case was reassigned, and the substitute judge devoted two pages of his order to the reasons why he was baffled by the directions on limited remand. Now that the matter has returned to us, defendants challenge whether we have jurisdiction. I agree with the majority that the case is properly before us on plaintiffs' original notice of appeal.

dismissal of plaintiffs' related state law claims by applying an unfamiliar rendition of the international comity doctrine, without addressing whether the district court correctly premised its decision on the foreign affairs doctrine. In its unwieldy opinion, which inappropriately reaches issues not before us, the majority does nothing but "keep the word of promise to our ear, [a]nd break it to our hope." *See id.* at 1677 (Breyer, J., concurring in the judgment). Because the majority would, without good reason, deny plaintiffs the right to seek basic justice, I must dissent.[3]

## A. *Alien Tort Statute Claims*

The ATS provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. In *Kiobel*, the Supreme Court held that this jurisdictional statute does not apply unless the ATS claims "touch and concern" the United States "with sufficient force to displace the presumption against extraterritorial application." 133 S. Ct. at 1669. The majority misinterprets *Kiobel* as requiring, in addition to a defendant's U.S. citizenship, "conduct" that occurred within the United States. For both procedural and substantive reasons, the majority is wrong to impose this standard on plaintiffs in this case.

In 2005, at the time the district court ruled on defendants' Rule 12(b)(6) motion to dismiss, *Kiobel* had not yet begun its path to the Supreme Court. *See Mujica v. Occidental*

---

[3] I do, however, concur with the conclusion that plaintiffs' claim under the Torture Victims Protection Act was appropriately dismissed because defendants are corporations.

*Petroleum Corp.*, 381 F. Supp. 2d 1164 (C.D. Cal. 2005); *see also Kiobel v. Royal Dutch Petroleum Co.*, 456 F. Supp. 2d 457 (S.D.N.Y. 2006), *aff'd in part, rev'd in part*, 621 F.3d 111 (2d Cir. 2010), *aff'd*, 133 S. Ct. 1659 (2013).  The district court based its dismissal of plaintiffs' ATS claims on the political question doctrine,[4] and plaintiffs' initial appearance before us, as well as their first brief submitted to us following the limited remand, predated the Supreme Court's decision in *Kiobel*.  Plaintiffs have never been given an opportunity at the district court level to amend their complaint in light of *Kiobel* or to move for jurisdictional discovery or similar relief.  *See Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977) ("a court may allow discovery to aid in determining whether it has in personam or subject matter jurisdiction").[5]  The majority ignores the liberality

---

[4] I would reverse the district court's ruling on the political question doctrine.  This case does not impact the relationship between the federal judiciary and the coordinate branches of the federal government.  *See Baker v. Carr*, 369 U.S. 186, 210 (1962).  Plaintiffs' ATS claims do not raise any issue that is constitutionally committed to another political department, the standards for deciding plaintiffs' ATS claims are "judicially discoverable and manageable," plaintiffs' ATS claims do not require an "initial policy determination" of a nonjudicial nature or an "unquestioning adherence to a political decision already made," and resolution of plaintiffs' ATS claims will not express any lack of respect for the legislative or executive branches or subject the parties to "multifarious pronouncements by various departments."  *See id.* at 217.

[5] The majority suggests that the pleading requirements of Rule 8 must be satisfied "*before* the discovery stage, not after it," citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009), but *Iqbal* has not been understood by our sister circuits to so hold.  *See Menard v. CSX Transp., Inc.*, 698 F.3d 40, 45 (1st Cir. 2012) (observing that "some latitude" is appropriate when the information needed for a "plausible" claim is in a defendant's control, and cautioning that *Iqbal* and its predecessor, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), must be "tempered by sound discretion" to achieve

with which leave to amend is to be granted, particularly when an intervening decision has meaningfully altered the standard for pleading, *see Moss v. U.S. Secret Serv.*, 572 F.3d 962, 972 (9th Cir. 2009), and engages in a flawed futility analysis.[6] Thus, even under the majority's misreading of *Kiobel*'s "touch and concern" test, simply affirming the dismissal of plaintiffs' ATS claims, without allowing plaintiffs a chance to conform their complaint to the majority's previously unannounced standard, is not an appropriate or fair result.

---

"a sensible compromise between competing legitimate interests"); *Loosier v. Unknown Med. Doctor*, 435 Fed. App'x 302, 307 (5th Cir. 2010) ("As we have said in the past, we do not require plaintiffs to plead facts peculiarly within the knowledge of defendants."); *see also Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 149 (2d Cir. 2011) (acknowledging that "a court should take care to give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction," but affirming the district court's denial of jurisdictional discovery because the relevant evidence was in the control of the plaintiff, not the defendants).

[6] The majority's reliance on *Bonin v. Calderon*, 59 F.3d 815 (9th Cir. 1995), for the proposition that futility "can, by itself, justify the denial of . . . leave to amend," *id.* at 845 (omissions by the majority), is misplaced in the context of this case. In *Bonin*, the assessment of futility had been performed in the first instance by the district court, and the issue on appeal was whether the district court had properly exercised its discretion. *Id.* at 845–46. In affirming the denial of leave to amend the petition for writ of habeas corpus, the *Bonin* Court simply agreed with the district court that the "proposed amendments are either duplicative of existing claims or patently frivolous, or both." *Id.* at 846. Unlike in *Bonin*, which came to federal court after trials in two different counties concerning the crimes committed in each, followed by direct appeals and state habeas corpus proceedings, we do not have the type of record that allows us to decide whether an attempt by plaintiffs to cure the deficiencies, if any, of their complaint would be futile.

The majority reaches its decision by improvidently extending *Kiobel*. *Kiobel* is limited to ATS claims by foreign nationals against foreign corporations concerning activities taking place on foreign soil. The *Kiobel* Court was "careful to leave open" for "further elaboration and explanation" a "number of significant questions," 133 S. Ct. at 1669 (Kennedy, J., concurring), including the extent to which ATS claims against entities incorporated and domiciled in the United States, like defendants in this case, are justiciable. In a separate opinion in *Kiobel*, four justices indicated that they would conclude jurisdiction exists under the ATS based solely on the fact that "the defendant is an American national." *Id.* at 1671 (Breyer, J., joined by Ginsburg, Sotomayor, and Kagan, JJ., concurring in the judgment).[7] As observed in that concurrence, "[m]any countries permit foreign plaintiffs to bring suits against their own nationals based on unlawful conduct that took place abroad." *Id.* at 1675. Indeed, the principle that a sovereign may exercise jurisdiction to prescribe the conduct of its nationals outside its territory is widely recognized. *See* Restatement (Third) of Foreign Relations Law § 402(2) (1987).

In concluding that a defendant's incorporation within the United States is an insufficient basis for jurisdiction under the ATS and that plaintiffs must allege some "conduct" within our borders, the majority misconstrues *Kiobel*'s "touch and concern" test, which is focused on the connection between the

---

[7] The majority incorrectly suggests that the opinion of these four Justices, concerning the sufficiency of U.S. citizenship to confer jurisdiction under the ATS, did not carry the day. *Kiobel* was decided on other grounds, and the Supreme Court explicitly left for another day the question presented in the instant case. The day for decision has now come, and we should accept the invitation of the concurring Justices and hold that U.S. citizenship is enough.

ATS "claims" and the United States. *See* 133 S. Ct. at 1669.
As recognized by the Fourth Circuit in a decision issued after
we heard oral argument in this case, the *Kiobel* Court's use of
the term "claims," rather than "alleged tortious conduct" or
similar phrases, in crafting the "touch and concern" standard
was purposeful, "suggesting that courts must consider all
facts that give rise to ATS claims, including the parties'
identities and their relationship to the causes of action." *Al
Shimari v. CACI Premier Tech., Inc.*, 758 F.3d 516, 527 (4th
Cir. 2014). The majority, however, essentially disregards
defendants' U.S. citizenship, which is a fundamental feature
of plaintiffs' ATS "claims," and which renders application of
the ATS, by definition, not extraterritorial. *Cf. Ahmed v.
Magan*, 2013 WL 4479077 (S.D. Ohio Aug. 20, 2013)
(concluding that the presumption against extraterritoriality
was rebutted by the defendant's status as a permanent
resident of the United States). Unless an ATS claim is
premised purely on vicarious liability,[8] a defendant who

---

[8] In summarizing the holdings of various post-*Kiobel* decisions, the
majority fails to recognize the distinction between vicarious liability and
direct claims. In both *Ben-Haim v. Neeman*, 543 Fed. App'x 152 (3d Cir.
2013), and *Balintulo v. Daimler AG*, 727 F.3d 174 (2d Cir. 2013), which
the majority cites for the proposition that other federal courts have found
U.S. citizenship alone inadequate, the ATS claims were premised solely
on vicarious liability. In *Ben-Haim*, the principals whose actions were
being challenged were all high-ranking Israeli officials, including a Justice
of Israel's Supreme Court, two former cabinet-level Ministers, and a judge
of the Haifa Rabbinical District Court. 543 Fed. App'x at 153. No
allegation was made that the U.S. defendants, namely three charitable
organizations, were directly involved in, or controlled the activities of the
Israeli officials in connection with, the child custody disputes underlying
the ATS claims; rather, the plaintiffs sought to hold the nonprofits
vicariously liable for lobbying in favor of policies that allegedly promoted
discrimination against fathers in Israeli courts. *Id.* Similarly, in *Balintulo*,
the principals were not U.S. nationals, but rather South African

violates the law of nations while domiciled in the United States must necessarily engage in at least one predicate act within our borders. The majority's treatment of U.S. citizenship as just "one factor" among other unspecified factors simply begs the question of what act is sufficient or how many acts are enough to establish jurisdiction. I would instead hold that the ATS confers jurisdiction when an ATS claim is brought against a domestic corporation or other U.S. national, without any allegation of underlying conduct within the United States.[9]

The ATS was enacted by our First Congress as a means of vesting in the district courts jurisdiction to hear private causes of action for certain torts in violation of the law of nations, including piracy. *See Sosa v. Alvarez-Machain*, 542

---

companies, and the complaint alleged only vicarious liability of the named defendants, three U.S. corporations, of which the South African companies were subsidiaries. 727 F.3d at 192. Unlike *Ben-Haim* and *Balintulo*, this case involves direct liability, with allegations that, during the raid on Santo Domingo, which was planned in Occidental's office at Caño Limón, three U.S. employees of AirScan manned the aircraft from which the targets of the cluster bombs were selected. Plaintiffs are entitled to the reasonable inference that such conduct could not have occurred absent financial and/or managerial support from defendants' U.S. offices. *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001) (for purposes of a Rule 12 motion, "all material allegations of the complaint are accepted as true, as well as all reasonable inferences to be drawn from them"). After all, we deal here not with whether plaintiffs have proven their ATS claims by a preponderance of the evidence, but instead with whether plaintiffs have pleaded "only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

[9] As indicated elsewhere in this partial dissent, if U.S. incorporation is not sufficient to confer jurisdiction over plaintiffs' ATS claims, I would at least allow plaintiffs an opportunity to amend their complaint to satisfy the "touch and concern" requirements imposed by the majority.

U.S. 692, 724–25 (2004) (citing 4 W. Blackstone, Commentaries on the Laws of England 68 (1769) [hereinafter "Blackstone"]).   Piracy and its modern-day equivalents, including torture and genocide, are of particular concern to the sovereign bearing primary responsibility for policing the activities of the perpetrators because failure to "animadvert upon them with a becoming severity" might render the sovereign "an accomplice or abettor of [its] subject's crime, and draw[] upon [its] community the calamities of foreign war."   4 Blackstone at 68; *see also Cardona v. Chiquita Brands Int'l, Inc.*, 760 F.3d 1185, 1193 (11th Cir. 2014) (Martin, C.J., dissenting) ("The United States would fail to meet the expectations of the international community were we to allow U.S. citizens to travel to foreign shores and commit violations of the law of nations with impunity."). In focusing on the ATS "claims," and not the underlying "conduct," the *Kiobel* Court carefully left open the door through which foreign victims of heinous acts by U.S. nationals could hold such individuals or corporate entities accountable.  The majority now unnecessarily slams the door shut.

Had plaintiffs conceded that no act related to the 1998 bombing in Santo Domingo occurred in the United States, the majority might have been justified in analyzing whether *Kiobel* should be extended to preclude ATS claims as to which the only "touch and concern" allegation is the fact of incorporation in the United States.   Plaintiffs, however, suggested quite the opposite.  They reminded us that the contract pursuant to which AirScan provided security services for Occidental in Colombia might have been executed within our borders. *Cf. Al Shimari*, 758 F.3d at 530–31 (holding that jurisdiction existed with regard to ATS claims arising from interrogations conducted by civilian contractors at the Abu

Ghraib prison because *inter alia* the contract to perform interrogation services in Iraq was issued in the United States to a U.S. corporation).  In addition, far from capitulating about the absence of any financial or managerial connection between the corporate facilities in our country and the events in Santo Domingo, plaintiffs have asked for leave to amend, with the decision in *Kiobel* as their new guide.  We should follow the lead of *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013 (9th Cir. 2014), and refrain from any "imprudent . . . attempt to apply and refine the touch and concern test," *id.* at 1028, when the pleadings before us were framed long before *Kiobel* was even conceived.  For the reasons articulated in *Doe I*, I would reverse and remand this case to allow plaintiffs to amend their complaint in light of *Kiobel*.  *See also Doe I & Doe VIII v. Exxon Mobil Corp.*, — F. Supp. 3d —, 2014 WL 4746256 at *14 (D.D.C. Sep. 23, 2014) ("[T]he Court is of the view that plaintiffs should have the opportunity to file for leave to amend their complaint in light of the intervening change in the law created by *Kiobel*.").[10]

---

[10] The majority cites this and several other district court decisions in an attempt to demonstrate some weight of authority in support of its misreading of *Kiobel*.  Two of these cases, however, are decided on alternate grounds, including the plaintiff's lack of standing, *Ahmed-Al-Khalifa v. Al-Assad*, 2013 WL 4401831 (N.D. Fla. Aug. 13, 2013), and the plaintiff's failure to qualify as "an 'alien' who may file suit under the ATS," *Mwangi v. Bush*, 2013 WL 3155018 (E.D. Ky. June 18, 2013).  Two other cases involve defendants who were neither U.S. citizens nor U.S. residents at the time they allegedly committed heinous acts on foreign soil.  *Warfaa v. Ali*, — F. Supp. 2d —, 2014 WL 3734121 (E.D. Va. July 29, 2014); *Mamani v. Berzaín*, — F. Supp. 2d —, 2014 WL 2069491 (S.D. Fla. May 20, 2014).  Yet other opinions concern motions for summary judgment, which require much more of the opposing party than the Rule 12 motion currently at issue, *see Adhikari v. Daoud & Partners*, 2013 WL 4511354 (S.D. Tex. Aug. 23, 2013), *modified on other grounds*, 994 F. Supp. 2d 831 (S.D. Tex. 2014); *Giraldo v. Dummond Co.*,

## B.  *State Law Tort Claims*

### 1.  *Foreign Affairs Doctrine*

The district court concluded that the foreign affairs doctrine precluded plaintiffs' wrongful death, intentional infliction of emotional distress, and negligent infliction of emotional distress claims.  *See Mujica*, 381 F. Supp. 2d at 1187–88.   While recognizing that tort law is within the traditional competence of the states, the district court reasoned that the strong federal foreign policy interests in this case, as evidenced by the Supplemental Statement of Interest filed by the United States, outweighed the weak interests of California concerning plaintiffs' tort claims.  *Id.*; *see also Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003).   I would affirm this portion of the district court's decision.   The majority, however, expressly declines to examine whether dismissal on the basis of the foreign affairs doctrine was appropriate.

---

2013 WL 3873960 (N.D. Ala. July 25, 2013), address a problem of potentially inconsistent judgments, which is not relevant here, *see Jovic v. L-3 Servs., Inc.*, — F. Supp. 3d —, 2014 WL 4748614 at *6 (N.D. Ill. Sep. 24, 2014) (observing that the Croatian military leaders who participated in Operation Storm, which the U.S. defendants allegedly helped plan and execute, were convicted of war crimes, but their convictions were later overturned), or are otherwise distinguishable, *see Doe I v. Cisco Sys., Inc.*, — F. Supp. 2d —, 2014 WL 4446381 at *5 (N.D. Cal. Sep. 5, 2014) (ruling that the plaintiffs had failed to establish the defendants "directed, planned, or committed the violations that occurred in China"); *see also In re South African Apartheid Litig.*, 2013 WL 6813877 (S.D.N.Y. Dec. 26, 2013) (relating to *Balintulo*, a vicarious liability case).   For the foregoing reasons, the various district court decisions on which the majority relies are of little persuasive value.

2. *International Comity Doctrine*

Instead of addressing the ground on which the district court actually relied in reaching its decision, the majority focuses on the district court's refusal to premise the dismissal of plaintiffs' state law claims on the doctrine of international comity. Declining to decide a matter on the basis of international comity is a form of abstention, and a district court's decision whether to abstain is subject to review only for an abuse of discretion. *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 422 (2d Cir. 2005); *Remington Rand Corp.-Del. v. Bus. Sys. Inc.*, 830 F.2d 1260, 1266 (3d Cir. 1987); *see Stock W. Corp. v. Taylor*, 964 F.2d 912, 918 (9th Cir. 1992). In concluding that the district court abused its discretion, the majority relies on a very suspect version of the international comity doctrine, which it substitutes for the foreign affairs doctrine as the reason to dismiss plaintiffs' state law claims. Although a district court's ruling may be affirmed on alternate grounds, prudence weighs against doing so when the original ground for dismissal is sound and the substitute basis involves, as here, announcing novel views regarding the underlying legal doctrine and reliance on facts unsupported by the record.

The majority cites to a law review article that describes international comity as "one of the most important, and yet least understood, international law canons." Donald Earl Childress III, *Comity as Conflict: Resituating International Comity as Conflict of Laws*, 44 U.C. Davis L. Rev. 11, 13 (2010). The majority's opinion raises more questions than it answers. The article explains that international comity may take three forms: (i) legislative or prescriptive comity, involving the extraterritorial reach of domestic legislation; (ii) executive comity, which offers deference to foreign

sovereignty; or (iii) adjudicative comity or the "comity of courts." *Id.* at 47. To invoke legislative comity as a basis for abstaining from deciding the merits of a case, a court must conclude that a "true conflict between domestic and foreign law" exists. *Hartford Fire Ins. Co. v. Cal.*, 509 U.S. 764, 798–99 (1993). When a person subject to regulation by two countries can comply with the laws of both, no conflict exists. *Id.* at 799.

Adjudicative comity arises in two contexts: (i) determining the preclusive effect or enforceability of a foreign ruling or judgment; or (ii) evaluating whether to stay or dismiss an action in a domestic court in favor of either a pending or future proceeding in a foreign forum. *See* 44 U.C. Davis L. Rev. at 47–48. The Eleventh Circuit has grouped these situations in a slightly different manner, describing "retrospective" application of adjudicative comity as either according respect to foreign judgments or deferring to parallel foreign proceedings, and "prospective" application as occurring when a domestic action is stayed or dismissed based on the respective interests of the domestic and foreign governments and the adequacy of the foreign forum in potentially resolving the dispute. *See Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004).

The Third Circuit has observed that, absent the "true conflict" required for legislative comity or a basis for "retrospective" application of adjudicative comity, United States courts "rarely" refrain from exercising their jurisdiction on the ground of international comity.[11] *Gross v.*

---

[11] As recognized by the district court, neither legislative comity nor retrospective adjudicative comity are relevant in this case. *See Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1134, 1154–64 (C.D. Cal.

*German Found. Indus. Initiative*, 456 F.3d 363, 393 (3d Cir. 2006).   Indeed, in *Gross*, the Third Circuit expressed skepticism about the Eleventh Circuit's use of "prospective" adjudicative comity, which appears inconsistent with "our 'virtually unflagging obligation' to exercise the jurisdiction granted to us, which is not diminished simply because foreign relations might be involved."  *Id.* at 394 (citations omitted). I would join the Third Circuit in declining to follow the Eleventh Circuit down the "prospective" comity path.  The majority, however, insists on forging ahead, despite the existence of a far less controversial basis for affirming the district court's decision, namely the foreign affairs doctrine, and adopts the "prospective" application of the adjudicative comity rubric.

Along the way, the majority characterizes as an abuse of discretion the district court's observation that, "at least in the Ninth Circuit, the application of international comity is generally limited to cases were there is a 'true conflict' between domestic and foreign law," and its subsequent conclusion that "it must treat the existence of a 'true conflict' as a threshold requirement." *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1134, 1155 (C.D. Cal. 2005) (citing *In re Simon*, 153 F.3d 991, 999 (9th Cir. 1998)).  Of course, *In re Simon* stands for the exact proposition stated by the district court, and contrary to the majority's suggestion, *In re Simon* was not merely a prescriptive comity case.  Rather, consistent with principles of adjudicative comity, *In re Simon* considered the fact that "there is no conflicting proceeding in

---

2005).  No "true conflict" exists between the laws of the United States and the laws of Colombia concerning the bombing of civilians, no foreign judgment has been procured by or against defendants, and no foreign proceedings involving defendants were ever ongoing.

a foreign nation." 153 F.3d at 999. Although I agree with the majority that the "true conflict" analysis discussed in *Hartford* was aimed solely at legislative or prescriptive comity, I am unwilling, in light of *In re Simon* and the Third Circuit's reasoning in *Gross*, to conclude that adjudicative international comity, whether "retrospective" or "prospective," does not contain a similar threshold.

I am also troubled by the majority's application of prospective adjudicative comity. When ruling on defendants' motion to dismiss on forum non conveniens and international comity grounds, the district court concluded that Colombia was not, at that time, an adequate forum because plaintiffs would be barred from recovering against defendants because they had already received reparation from the Colombian government. 381 F. Supp. 2d at 1147–48. On limited remand, the substitute district judge interpreted his task as determining whether prudential exhaustion applied to plaintiffs' ATS claims; he did not engage in such analysis with respect to plaintiffs' state law claims. The district judge concluded that exhaustion of local remedies was not required because the nexus between plaintiffs' ATS claims and the United States was sufficiently strong, primarily because defendants are U.S. corporations, and the ATS claims involved matters of "universal concern." I agree with this conclusion. *See Sarei v. Rio Tinto, PLC*, 550 F.3d 822, 824 (9th Cir. 2008) (en banc).

The remainder of the substitute district judge's order on limited remand, in which he indicated his belief that defendants can prove the availability of local remedies for plaintiffs' claims and plaintiffs' failure to exhaust them, is merely dictum. The majority, however, credits it over the earlier contrary conclusion of the original district judge,

which was necessary to his decision to deny defendants'
motion on forum non conveniens and international comity
grounds. To elevate, in this manner, dictum that was uttered
for an entirely different purpose, concerning a wholly
separate legal doctrine, contradicts virtually every principle
of stare decisis and is simply not the way in which our courts
should operate.

In addition, the majority's conclusion that plaintiffs could
have sued defendants in Colombia in September 2000, when
they commenced their action against the Colombian
government, is erroneously premised on defendants' waivers
of personal jurisdiction defenses, provided in connection with
their August 2004 motion to dismiss for forum non
conveniens. The record contains no basis for believing that
defendants, who have made, throughout the 11-year span of
this case, every possible argument that might justify
dismissal, would have foregone such defenses had they
actually been joined in the litigation in Colombia. In sum,
because the dismissal of plaintiffs' state law claims can be
affirmed on the ground articulated by the district court, I see
no reason to expand the scope of the international comity
doctrine, particularly when the procedural posture and facts
of this case do not support the result reached under the
majority's newly minted standard.

## C. *Conclusion*

The majority needlessly announces novel standards that
will thwart the ability of not only these plaintiffs, but also of
every other alien who seeks to hold a U.S. corporation
accountable for atrocities committed abroad. Having enjoyed
the benefits of incorporation within the United States,
defendants in this case should also be required to answer in

a court of the United States for any role they might have played in the 1998 bombing of Santo Domingo.